## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| RISE ST. JAMES LOUISIANA, MICAH SIX EIGHT MISSION, THE DESCENDANTS PROJECT, THE CONCERNED CITIZENS OF ST. JOHN INC., CLAIBORNE AVENUE ALLIANCE DESIGN STUDIO, INC., and JOIN FOR CLEAN AIR, <br><br> Plaintiffs, <br><br> v. <br><br> COURTNEY J. BURDETTE, in her official capacity as Secretary of the Louisiana Department of Environmental Quality; JERRY LANG, in his official capacity as Assistant Secretary for Environmental Compliance at the Louisiana Department of Environmental Quality; and LIZ MURRILL, in her official capacity as Attorney General of Louisiana, <br><br> Defendants. | Civil Action No. |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiffs RISE St. James Louisiana (RISE), Micah Six Eight Mission (Micah 6:8), The Descendants Project (TDP), The Concerned Citizens of St. John Inc. (CCSJ), Claiborne Avenue Alliance Design Studio, Inc. (Claiborne), and JOIN for Clean Air (JOIN) bring this action for declaratory and injunctive relief against defendants Courtney J. Burdette, in her official capacity as Secretary of the Louisiana Department of Environmental Quality (LDEQ); Jerry Lang, in his official capacity as Assistant Secretary for Environmental Compliance at LDEQ; and Liz Murrill, in her official capacity as Attorney General of Louisiana. Defendants are Louisiana state officials who share responsibility for enforcing the Louisiana Community Air Monitoring Reliability Act (CAMRA), Louisiana Revised Statutes (L.R.S.) §§ 30:2381.1-.11.

2.      Community air monitoring refers to programs organized by groups of local residents to monitor air quality in their local communities. Using modern, low-cost air sensor

technology, these programs help detect pollution levels in areas of the country not well served by traditional and costly air monitoring systems. Recognizing the value of community air monitoring programs, Congress and the Environmental Protection Agency (EPA) have encouraged their development through grants and other programs to assist local groups in obtaining and utilizing air sensors to detect air pollution in their communities.

3.      In enacting CAMRA, the Louisiana legislature targeted community air monitoring for unique and onerous restrictions. Under CAMRA, community groups cannot choose for themselves how they will collect, use, or disseminate information or analyses about air quality to the public. Community groups are even forbidden from sharing with regulators information that does not satisfy CAMRA's standards and from relying on such information to exercise their right to bring suit under the citizen suit provisions of the Clean Air Act, or to bring other claims against polluters. Community groups that transgress CAMRA's restrictions face crippling civil penalties in state or private enforcement actions. These restrictions and penalties do not apply to the use of air sensors or any air monitoring by LDEQ or by industry.

4.      The state legislature enacted CAMRA for the ostensible goal of "provid[ing] the public with access to accurate air quality information." L.R.S. § 30:2381.2. CAMRA purports to do so by directly regulating the content of speech by community groups—and only community groups—to shield the public from information about air quality that the state has deemed objectionable. CAMRA even makes it unlawful—and punishable by civil penalties—for community groups to use the air quality information that they have obtained to petition federal regulators and the courts for redress against polluters. But the First and Fourteenth Amendments to the U.S. Constitution prohibit Louisiana from silencing private speech and imposing restrictions

on the right to petition because the government questions the accuracy of the information conveyed.

5.    CAMRA also conflicts with federal law. The Clean Air Act and federal funding laws promote greater use of air monitoring in underserved local communities. Through EPA actions and citizen suits, the Clean Air Act also encourages enforcement actions to ensure compliance with federal emissions limits. CAMRA frustrates these federal objectives by effectively barring deployment of modern, low-cost air sensor technology by community groups and by making it unlawful for groups to use the data and analysis obtained from air sensors to enforce federal requirements.

## JURISDICTION AND VENUE

6.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the U.S. Constitution, and the Clean Air Act, 42 U.S.C. §§ 7401 *et seq*.

7.    This Court has authority to enjoin enforcement of CAMRA under 42 U.S.C. § 1983 and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8.    Venue is proper in this district under 28 U.S.C. § 1391(b) because all Defendants maintain an office and conduct their official duties within this judicial district. Additionally, substantial events giving rise to this lawsuit occurred and will continue to occur within this judicial district. Defendants' actions to enforce CAMRA will substantially occur at their governmental offices, which are located in this district.

## PARTIES

9.    Plaintiff RISE St. James Louisiana is a faith-based Louisiana nonprofit corporation founded in 2018, dedicated to environmental justice as it works to stop the proliferation of petrochemical industries in the Louisiana River Parishes and throughout Louisiana. Its members

3

live and work throughout the River Parishes and have been exposed to elevated levels of carcinogenic airborne contaminants emitted from the many adjacent industrial pollution sources. RISE has sought to collect its own air monitoring data to compensate for the dearth of state-provided air quality information in its community and has shared the results of air quality monitoring studies to inform the community about health risks and the significance of proposals to add new industrial pollution sources in the immediate vicinity.

10.    Plaintiff Micah Six Eight Mission is a Louisiana nonprofit corporation that began in 2018 focusing on mutual aid and food insecurity. In 2020, Micah 6:8 began environmental justice work with the mission of providing mutual aid to community members in Portie Town suffering from the devastation of Hurricanes Laura and Delta. The extreme weather faced by residents—potentially worsened by the nearby industries emitting significant greenhouse gases—convinced founder Cynthia "Cindy" Robertson to raise awareness about local pollution. To further that work, Micah 6:8 began conducting community air monitoring in 2022 using funding from an EPA grant to purchase, install, and operate air sensor devices.

11.    Plaintiff The Descendants Project is a Louisiana nonprofit corporation that began in 2020 with the mission of raising awareness of and remediating slavery's legacy of environmental and socioeconomic injustice. Pursuant to that mission, TDP reclaims plantation buildings often targeted for industry development and repurposes them to educate their community on the history of enslaved people and their descendants and on the pollution that the community now faces. TDP has successfully advocated against further development that would cause significant air and water pollution and risk public health. To further that advocacy, in 2021, TDP began conducting community air monitoring on members' properties and planned to share results at one of its repurposed plantation buildings.

12.    Plaintiff The Concerned Citizens of St. John Inc. is a Louisiana nonprofit corporation created following a 2016 community event in which EPA representatives shared that St. John Parish has a high county-level cancer risk related to chloroprene, which the nearby Denka facility emits. CCSJ advocates for the health and safety of all citizens by holding government and industry accountable for the quality of St. John Parish's air, water, and soil. To accomplish that, in 2022, CCSJ began testing the air around members' residences for chloroprene, ethylene oxide (EtO), particulate matter (PM), and volatile organic compounds (VOCs).

13.    Plaintiff Claiborne Avenue Alliance Design Studio, Inc. is a Louisiana nonprofit corporation born from the Claiborne Avenue Alliance, a coalition of residents, property and business owners founded in 2017 and dedicated to the thoughtful development of the area affected by the elevated I-10 expressway along Claiborne Avenue. The expressway cuts through a predominantly Black neighborhood and contributes significant noise and air pollution, including PM. It incorporated in 2022 with intentions of helping other communities advocate for safer, healthier, and more beneficial uses of their spaces. In 2023, it received an EPA grant requiring the design studio to monitor the air around I-10 for particulate matter and to report on their findings.

14.    Plaintiff JOIN for Clean Air is a Louisiana nonprofit corporation started in late 2019 when residents in and around Gretna, Harvey, Marrero, and uptown New Orleans began increasingly smelling fumes from a BWC facility, which stores molten asphalt, fuel oil, and other pungent petrochemicals. The growing odor issue coincided with BWC's expansion. JOIN began sharing links to report odors and reported on LDEQ's permitting of the facility with the primary mission of improving air quality for public health. When LDEQ's monitoring response to the hundreds of odor complaints detected fine particulate matter in excess of national standards, after

LDEQ removed the monitor, JOIN began conducting its own community air monitoring to ensure accurate testing and compliance with those standards.

15.     Defendant Courtney J. Burdette is the Secretary of the Louisiana Department of Environmental Quality. In that capacity, she is the state official responsible for enforcing CAMRA.

16.     Defendant Jerry Lang is the Assistant Secretary for Environmental Compliance at the Louisiana Department of Environmental Quality. In that capacity, he may enforce CAMRA through the issuance of orders requiring compliance within CAMRA.

17.     Defendant Liz Murrill is the Attorney General of Louisiana. In that capacity, she shares responsibility for enforcement of CAMRA through civil actions.

## STATEMENT OF FACTS AND LAW

### Clean Air Act Framework

18.     Congress enacted the Clean Air Act to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population" and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." 42 U.S.C. § 7401(b)(1), (2). Congress declared a "primary goal" of the Clean Air Act to be "to encourage or otherwise promote reasonable Federal, State, and local governmental actions … for pollution prevention." *Id*. § 7401(c).

19.     The Clean Air Act directs EPA to "establish a national research and development program" to prevent and control air pollution. *Id*. § 7403(a). In implementing that program, EPA may "provide financial assistance" to state, local, and tribal governments and "other appropriate public or private agencies, institutions, and organizations, and individuals," including by "mak[ing] grants" to those entities. *Id*. § 7403(a)(2), (b)(3). In cooperation with those entities, EPA also may "collect and disseminate … basic data on chemical, physical, and biological effects of

6

varying air quality and other information pertaining to air pollution and the prevention and control thereof." *Id*. § 7403(b)(6).

20.    As part of the research and development program, Congress also required EPA to "conduct a program of research, testing, and development of methods for sampling, measurement, monitoring, analysis, and modeling of air pollutants." *Id*. § 7403(c).

21.    The Clean Air Act also directs EPA to establish emissions standards for air pollutants.

22.    National ambient air quality standards (NAAQS) apply to emissions that EPA has determined "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7408(a)(1). EPA has issued NAAQS for six pollutants: ozone, particulate matter (including both fine particulate matter 2.5 micrometers or less and particulate matter 10 micrometers or less), carbon monoxide, lead, sulfur dioxide, and nitrogen dioxide. 40 C.F.R. Part 50. These six pollutants are collectively called "criteria air pollutants." EPA sets standards for emissions of the six criteria pollutants from stationary sources, which is "any building, structure, facility, or installation which emits or may emit any air pollutant." *Id.* § 7411(a)(3).

23.    The Clean Air Act directs EPA to regulate emissions of hazardous air pollutants emitted by stationary sources. *Id.* § 7412(a)(3). EPA currently regulates about 188 chemicals designated as hazardous air pollutants. *Id.* § 7412(b); 40 C.F.R. §§ 63.60–.64.

24.    EPA emission standards under the Clean Air Act are minimum requirements. The Clean Air Act permits states to impose stricter air pollution standards. 42 U.S.C. § 7416.

25.    The Clean Air Act permits states to accept responsibility for enforcing the emission standards promulgated by EPA. *Id.* §§ 7410, 7411(c), 7414(b). Louisiana has elected to accept

responsibility for enforcing EPA's air pollution standards. L.A.C. Title 33, Part III. In addition to criteria air pollutants and hazardous air pollutants, Louisiana regulates certain other chemicals designated as "toxic air pollutants." *Id*. § 33:5103.

26.     EPA may bring an administrative or judicial action based on "any information available" to enforce the emissions standards under the Clean Air Act. 42 U.S.C. § 7413(a), (b), (d). The Clean Air Act authorizes EPA to pay an award to "any person who furnishes information" leading to a criminal conviction or a judicial or administrative civil penalty. *Id.* § 7413(f).

27.     Under the Clean Air Act, "any person" may bring a civil action for violations of an "emission standard or limitation" or an EPA or state order "with respect to such a standard or limitation." *Id*. § 7604(a)(1). Such private actions are referred to as citizen suits. Before filing a citizen suit, a plaintiff must provide 60 days' notice to the EPA and the state. *Id*. § 7604(b)(1). A citizen suit may not be filed if the EPA or the state is diligently prosecuting a civil action against the polluter. *Id*.

**EPA's Promotion of Air Monitoring Systems and Air Sensors**

28.     EPA has developed various air monitoring systems to determine the levels of criteria air pollutants and hazardous air pollutants in the atmosphere.

29.     For criteria air pollutants, EPA operates an "Air Quality System" that compiles information from monitoring stations, called reference monitors, which detect air pollution using methods that EPA has designated as Federal Reference Methods (FRMs) or Federal Equivalent Methods (FEMs).[1] Reference monitors are subject to EPA requirements governing siting, operational plans, and quality assurance procedures. *See* 40 C.F.R. Parts 50, 53, 58.

---

[1] EPA, The Enhanced Air Sensor Guidebook 28 (Sept. 2022), available through https://cfpub.epa.gov/si/si_public_record_report.cfm?Lab=CEMM&dirEntryId=356426.

30.    For hazardous air pollutants, EPA primarily relies on the National Air Toxics Trends Station (NATTS) Network. The NATTS network consists of 27 sites throughout the United States, which monitor the air for over 100 pollutants.[2] EPA has issued monitoring methods that provide guidance on how to measure for atmospheric levels of hazardous air pollutants.[3]

31.    Reference monitors and NATTS monitors are expensive to deploy and operate. According to a recent LDEQ estimate, regulatory-grade monitors cost $791,000 per monitoring site plus an additional $150,000 to $200,000 annually in operating and maintenance costs for each monitoring site.[4]

32.    The high cost of regulatory grade monitors results in coverage gaps in many areas of the country. To help fill the gaps, EPA has promoted the deployment and use of air sensors.[5] Air sensors are lower in cost and generally more portable and easier to operate than regulatory-grade monitors. Although not as precise as regulatory-grade sensors, EPA has recognized that air sensors can provide important information to the public about air quality in their communities.[6]

33.    EPA has funded studies to examine the use of air sensor technology for community air monitoring for many years. For instance, in 2014, EPA issued a request for applications

---

[2] EPA, Air Toxics–National Air Toxics Trends Stations, https://www3.epa.gov/ttnamti1/natts.html.

[3] EPA, Air Monitoring Methods, https://www.epa.gov/amtic/air-monitoring-methods; EPA, Air Toxics–Monitoring Methods, https://www3.epa.gov/ttnamti1/airtox.html.

[4] LDEQ, *Report: Louisiana Senate Concurrent Resolution 30 to Study Implementation of Real-Time Community Air Monitoring and Notification Systems* 16 (2025).

[5] EPA Tools & Resources Webinar Q&A, Enhanced Air Sensor Guidebook 1, https://www.epa.gov/system/files/documents/2023-06/TR_Enhanced%20Air%20Sensor%20Guidebook_QA_Final.pdf.

[6] EPA, Air Sensor Toolbox, https://www.epa.gov/air-sensor-toolbox.

"proposing research on empowering communities and individuals to take action to avoid air pollution exposure, using low-cost portable air pollution sensors."[7]

34.    In the American Rescue Plan of 2021 (ARP), Congress appropriated $50,000,000 to support EPA's research and development program. Pub. L. No. 117-2, § 6002(a)(2), 135 Stat. 4, 93. EPA has allocated a portion of this funding to support community air monitoring, including through the use of commercially available air sensors.[8] These grants are designed to enable "communities to monitor their own air quality."[9] EPA has also used this funding to support agency mobile monitoring labs or air sensor loan programs to "improve EPA's ability to support communities in need of short-term monitoring and air quality information."[10]

35.    In the Inflation Reduction Act of 2022 (IRA), Congress provided additional funding for EPA's research and development program. Pub. L. No. 117–169, § 60105, 136 Stat. 1818, 2067 (2022). Congress specified that IRA funding should be used to "deploy, integrate, support, and maintain fenceline air monitoring, screening air monitoring, national air toxics trend stations, and other air toxics and community monitoring," *id.* § 60105(a), and "to deploy, integrate, and operate air quality sensors in low-income and disadvantaged communities," *id.* § 60105(c). Another IRA provision provided funding for environmental and climate justice block grants, which a community-based nonprofit organization may use for "community-led air and other pollution monitoring, prevention, and remediation." 42 U.S.C. § 7438.

---

[7] EPA, National Ctr. for Env't Resh., Air Pollution Monitoring for Communities, EPA-G2014-STAR-K1, available through https://www.grants.gov/search-results-detail/257069 (related documents tab).

[8] Enhanced Air Quality Monitoring for Communities, Request for Applications (RFA) EPA-OAR-OAQPS-22-01, Questions and Answers, at 19–20, https://www.epa.gov/system/files/documents/2022-03/eaqm-arp-rfa-qa-03-22-22.pdf.

[9] *Id.* at 20.

[10] *Id.* at 39.

36.    EPA has used ARP and IRA funds to support community air monitoring in Louisiana. In November 2022, EPA awarded LDEQ, LSU Health Foundation, Deep South Center for Environmental Justice Inc., and the Louisiana Environmental Action Network a total of $2,399,604 to support various community air monitoring initiatives.[11] In 2023, EPA used IRA and ARP funds to award LDEQ a grant of nearly $480,000 to support a community air monitoring project in St. James Parish.[12]

37.    EPA has also promoted air monitoring through other sources of funding. For instance, in 2023, LDEQ was awarded $1 million from EPA's Government-to-Government grant program to "develop a new air monitoring van which will provide air quality data for compounds such as formaldehyde, sulfur dioxide, hydrogen sulfide, ammonia, ethylene oxide, hydrocarbons, oxygenates and nitrogen compounds," for use "during emergency response[] incidents such as hurricanes."[13]

38.    As discussed in more detail below, several Plaintiffs have also received grants from EPA to conduct community air monitoring.

39.    In Louisiana and nearby states, EPA makes air sensors available for loan to State, local, and tribal agencies, community groups, schools, and other organizations "to empower communities to drive positive change and improve public health through better understanding of

---

[11]  EPA, *EPA Announces Louisiana to Receive Nearly $2.4 Million for Air Monitoring Projects* (Nov. 3, 2022), https://www.epa.gov/newsreleases/epa-announces-louisiana-receive-nearly-24-million-air-monitoring-projects.

[12]  EPA, *EPA, Rep. Troy Carter Announce Grant for La. DEQ Air Monitoring Project in St. James Parish* (June 5, 2023), https://www.epa.gov/newsreleases/epa-rep-troy-carter-announce-grant-la-deq-air-monitoring-project-st-james-parish.

[13]  EPA, *EPA Announces Over $3 Million in Grants Prioritizing Environmental Justice in Louisiana* (Nov. 16, 2023), https://www.epa.gov/newsreleases/epa-announces-over-3-million-grants-prioritizing-environmental-justice-louisiana.

air quality."[14] This loan program provides access to the "PurpleAir" sensor used by several of the Plaintiffs, which "measures fine particulate matter (PM2.5)" and permits WiFi connection "for private or public data streaming."[15]

40.    EPA also loans air sensors for air monitoring in areas that experience wildfire smoke.[16] Sensor data is displayed on EPA's AirNow Fire and Smoke Map side by side with data from regulatory monitors.[17]

**CAMRA's Restrictions on Community Air Monitoring**

41.    Enacted in 2024, CAMRA purports to regulate community groups that engage in air monitoring "to ensure that the data collected from such programs provides the public with access to accurate air quality information." L.R.S. § 30:2381.2.[18] CAMRA seeks to achieve that objective by imposing content- and viewpoint-based restrictions on community groups that seek to inform the public of the state of air quality in their local communities using data collected from air sensors. These restrictions silence free speech, infringe on their right to petition, and undermine

---

[14] EPA, Air Sensor Loan Program, EPA Region 6, https://www.epa.gov/air-sensor-toolbox/air-sensor-loan-programs#r6.

[15] *Id*.

[16] EPA, Wildfire Smoke Air Monitoring Response Technology (WSMART), https://www.epa.gov/air-sensor-toolbox/wildfire-smoke-air-monitoring-response-technology-wsmart.

[17] EPA, EPA Research Improves Air Quality Information for the Public on the AirNow Fire and Smoke Map (July 5, 2022), https://www.epa.gov/sciencematters/epa-research-improves-air-quality-information-public-airnow-fire-and-smoke-map; *see* AirNow, Fire and Smoke Map, https://fire.airnow.gov; EPA, Participatory Science at EPA (last updated Mar. 19, 2025), https://storymapsu.arcgis.com/stories/57b2ee78221341a18b0f7ebe8017340d.

[18] Although the Louisiana legislature provided that CAMRA should be codified at L.R.S. § 30:2383.1 *et seq.*, CAMRA was codified at L.R.S. § 30:2381.1 *et seq*. This complaint cites to CAMRA provisions as codified in Louisiana's Revised Statutes.

federal laws and policies designed to improve air quality through greater deployment of air sensors and other means.

42.    Four of CAMRA's provisions restrict how community groups can collect, use, and disseminate information about air quality.

43.    **Section 2381.5** requires community air monitoring programs to use EPA-designated methods to monitor for criteria air pollutants, hazardous air pollutants, or toxic air pollutants, if the community group conducts monitoring for "purpose of alleging a violation of or noncompliance with the Clean Air Act, the Louisiana Environmental Quality Act, or any other applicable law, rule, or regulation for which the state has primary enforcement authority" (hereinafter, clean air laws).

44.    EPA methods specified in Section 2381.5 are designed for use by regulatory-grade monitors such as reference monitors and NATTS monitors. Air sensors are designed to be low-cost and portable and do not rely on methods designed for regulatory-grade monitoring systems. Section 2381.5 therefore allows community groups to use air sensors to conduct air monitoring only if the groups do not speak when air sensor data indicates that the clean air laws are *not* being complied with. Section 2381.5 does not regulate the methods of collecting air quality data used to allege or demonstrate *compliance* with clean air laws.

45.    **Section 2381.6** restricts how community groups collect and analyze air quality data. It provides that groups "shall use" EPA-approved methods. It requires community groups to provide a "quality assurance certification," the requirements of which are not specified in the statute, with their analysis if the analysis is not performed by a state-approved laboratory. Section 2381.6 also prohibits use of "proprietary or not publicly available equipment or methods." Community groups therefore cannot prepare—and consequently cannot use or disclose—an

analysis of air quality that uses equipment or methods that have not been EPA-approved. Groups that seek to disseminate publicly an analysis of air quality that was not conducted by a state-approved lab will be compelled to make a "quality assurance certification" as part of their speech, without any reasonable assurance that the content of the certification would satisfy CAMRA's requirements.

46. **Section 2381.9** directly restricts and compels speech. Entitled "Data communication," this provision provides that "[a]ny release or communication of the collected monitoring data shall include clear explanations of data interpretation, appropriate context, including the applicable or comparable ambient air standard data limitations, and relevant uncertainties." This provision applies even to data collected using EPA-designated methods. A community group violates this provision if it disseminates any air monitoring data without the requisite "clear explanations." CAMRA does not establish standards for evaluating when the required explanations are "clear" and does not define the content that it requires to be included in these explanations.

47. **Section 2381.10** regulates use of monitoring data produced through community air monitoring programs. First, air monitoring data is deemed insufficient to demonstrate that any source is violating an emission standard, but only where that data comes from community air monitoring programs. Second, "[t]o promote compliance" with CAMRA, LDEQ may not use, disclose, or disseminate air monitoring data in connection with enforcement actions if, and only if, the data comes from community air monitoring programs that do not comply with CAMRA. Third, these prohibitions on using data from community air monitoring programs apply to any person alleging a violation or noncompliance with clean air laws. Air monitoring data from sources other than community air monitoring programs are not subject to similar restrictions.

48.     Individually and in combination, the foregoing CAMRA provisions impose unique and onerous burdens on speech by community groups engaged in air monitoring. The requirement to adhere to EPA standards designed for regulatory-grade monitors effectively prevents community groups from using air sensors, which is the principal equipment used by such groups to conduct air monitoring. And even if a community group were able to satisfy those standards, its ability to analyze, use, and disseminate data and analysis would be severely constrained.

49.     CAMRA's restrictions on speech do not apply to industry actors. Although CAMRA applies to "entities that [have] received public funds or use private funds," it expressly excludes "reporting entities," a term defined to mean "any organization, group, company, owner, or operator of a stationary source developing or administering an air monitoring program." L.R.S. § 30:2381.4(2), (11). The intent of the exclusion for "reporting entities" is to ensure that industry participants are not among the entities to which CAMRA applies and to permit them to collect, use, and disseminate air monitoring information "for any purpose." *Id.* § 30:2381.4(2).

50.     LDEQ also may collect, use, and disseminate information from air monitors, including air sensors, without complying with CAMRA. For instance, LDEQ operates mobile air monitoring labs that can be deployed throughout the state.[19] These mobile labs detect the levels of hydrogen sulfide, methane, and ammonia using instruments that have not been approved by EPA. On information and belief, LDEQ does not comply with CAMRA's requirements when analyzing and disseminating the information collected from its mobile labs.

51.     LDEQ also publishes air quality information on its website, which includes a rating about how clean or unhealthy the air is. LDEQ states that this information "has not been quality

---

[19] LDEQ, Mobile Air Monitoring Lab (MAML), https://deq.louisiana.gov/page/mobile-air-monitoring-lab.

reviewed or validated" and ratings for particulate matter "are not NAAQS comparable."[20] This analysis of air quality does not include a quality assurance certification and was not conducted by a state-approved lab, as is required for community groups under section 2381.6 of CAMRA. LDEQ releases this information without providing the "clear explanations" of data interpretation, appropriate context and relevant uncertainties that would be required of community groups under section 2381.9 of CAMRA.

52.    Thus, although CAMRA purports to serve the goal of providing the public with "access to accurate air quality information," L.R.S. § 2381.3, the law creates speaker-based distinctions that presume that air monitoring information lacks accuracy if disseminated by community air monitoring groups, but not by industry participants or the state.

53.    CAMRA does not exempt communications with federal and state regulators from its requirements. Thus, a community group is forbidden from disclosing air monitoring data and analysis to EPA or LDEQ without complying with CAMRA's requirements.

54.    The Clean Air Act contemplates that EPA may bring enforcement actions based on "any information available" and, to that end, authorizes EPA to pay awards to persons who furnish information to EPA. 42 U.S.C. § 7413(a), (b), (d), (f). CAMRA frustrates these policies by barring community groups that do not comply with CAMRA from sharing air monitoring information with EPA.

55.    CAMRA does not exempt communications made in connection with administrative or judicial actions from its requirements. In fact, section 2381.10 expressly restricts the use of monitoring data obtained through community air monitoring in such proceedings if CAMRA's requirements have not been met. A community group therefore violates CAMRA if it provides

---

[20] LDEQ, Air Monitoring Data & AQI, https://airquality.deq.louisiana.gov/.

monitoring information that does not comply with CAMRA's requirements to EPA or LDEQ for use in enforcement actions. A community group also violates CAMRA if it uses monitoring information that does not comply with CAMRA's requirements to file or prosecute a citizen suit under the Clean Air Act or to provide the 60 days' prior notice of a violation to EPA or LDEQ that is required before a citizen suit may be filed. 42 U.S.C. § 7604.

56.     Community groups that do not comply with CAMRA's requirements face civil penalties, injunctions and cease and desist orders, and damages liability. L.R.S. § 30:2025. The state may seek civil penalties of up to $32,500 per day and an additional $1 million penalty if the violation is intentional, willful, or knowing. *Id.* § 30:2025.E(1)(a).

57.     CAMRA may be enforced by private parties. *Id.* § 30:2026. In a private action, a court may award the plaintiff civil penalties and injunctive relief. *Id.*

## HARM TO PLAINTIFFS

58.     <u>RISE St. James Louisiana.</u> Before April 2024, neither LDEQ nor any other government agency performed long term, publicly accessible air monitoring in the 5th District of St. James Parish.[21] RISE members thus had no state-provided information about harmful pollution or general air quality in their neighborhood.[22]

59.     To fill that informational gap, in 2022, RISE installed PurpleAir PM monitors at its members' houses. The PurpleAir monitors provided RISE members with information about levels

---

[21] LDEQ, *St. James*, https://www.deq.louisiana.gov/page/STJAMES (last visited May 20, 2025). LDEQ has conducted some short-term mobile monitoring activities in St. James Parish. LDEQ, *Discover DEQ* (Dec. 2022), https://www.deq.louisiana.gov/assets/docs/DiscoverDEQ/2022/DiscoverDEQNewsletter-Issue131-December2022.pdf.

[22] In April 2024, LDEQ began operating a monitoring station in St. James Parish, but it is not listed in LDEQ's 2025 Air Monitoring Network Plan, so it is likely only temporary. LDEQ, *2025 Louisiana Annual Monitoring Network Plan* (Feb. 14, 2025) https://edms.deq.louisiana.gov/app/doc/view?doc=14710861.

of PM pollution so they could respond when the pollution spiked to harmful levels. RISE used the air pollution data it collected from the PurpleAir monitors to prepare public comments opposing the grant of an air permit for a proposed Formosa Plastics facility. Although these PurpleAir monitors are currently not in use due to hurricane damage, RISE wishes to install undamaged ones. PurpleAir monitors do not use either FRM or FEM for monitoring particulate matter. Because PurpleAir monitors do not meet CAMRA's standards, RISE has been unwilling to start using them again, and RISE has refrained from publishing further reports on its existing PurpleAir data.

60.    RISE also partnered with Johns Hopkins University (JHU) to monitor ambient concentrations of particulate matter at the home of RISE Founder, Chief Executive Officer, and Director Sharon Lavigne. Particulate matter is a serious concern at Ms. Lavigne's home because of grain dust emissions from the Zen-Noh Grain Corporation Grain Processor located directly across the river less than one half mile from Ms. Lavigne's front door. In September 2022, JHU researchers began operating a QuantAQ Modulair-PM air quality monitor capable of continuously measuring various types of particulate matter—$PM_{10}$, $PM_{2.5}$, and $PM_1$. The QuantAQ Modulair-PM air quality monitor does not use FRM or FEM to detect particulate matter. Though RISE removed that monitor for maintenance, it would like to reinstall it soon and continue collecting readings from it. However, CAMRA's restrictions and severe financial penalties deter RISE from doing so.

61.    RISE wishes to conduct further air monitoring to further the organization's goal of protecting St. James Parish and other fenceline community members from harmful pollution. At monthly membership meetings, RISE members have discussed the need to monitor for chloroprene, EtO, formaldehyde, and other pollutants. LDEQ does not conduct air monitoring for chloroprene or EtO in St. James Parish. RISE would have difficulty affording the devices and

methodology CAMRA requires, and as a result, it would likely not be able to collect this important data. RISE is concerned that, without air quality data collected through non-CAMRA approved methods, it will be unable to educate community members and further its advocacy for clean air. It is also concerned about the stringent financial penalties or other legal repercussions for conducting community air monitoring using devices or methods—or further disseminating results from such devices or methods—prohibited by CAMRA.

62.     Having access to accurate community-level data of current air quality conditions is critical to RISE's advocacy and education efforts. If the court struck down CAMRA, RISE would resume community air monitoring using PurpleAir devices, apply for grants to install monitoring for pollutants of special interest to its members, and commission additional mobile monitoring. Because information about air quality is of great interest to its members, RISE would publicly disseminate data collected from these devices on a website or in published reports.

63.     <u>Micah Six Eight Mission.</u> In 2022, Micah 6:8 began using eight PurpleAir devices—purchased using a grant from Lowlander Center—in Sulphur, Westlake, Dequincy, Lake Charles, and Hayes, Louisiana to monitor particulate matter and volatile organic compounds. Micah 6:8 chose to monitor those pollutants after reviewing air permits from nearby emitters and learning that they emitted those pollutants. After Micah 6:8 members observed black smoke and experienced odors from nearby facilities—Westlake Corporation, Citgo, Indorama Ventures, Phillips 66, LyondellBasell, Entergy, Firestone Polymers, PPG Paints, Sasol, and more—Micah 6:8 determined it needed information on local air quality to better inform its community of health and environmental risks. That information was not readily available to it from LDEQ, which advised Micah 6:8 that state monitoring is not intended to evaluate localized air pollution. The next closest monitors are located ten miles away in Carlyss and seventeen miles away in Vinton,

farther away from Westlake's industrial pollution sources. The current LDEQ monitors are only available in very limited locations far away from industry and do not currently measure VOCs. Therefore, they are insufficient for community members who need that information to determine whether to take precautions for their health.

64.    In 2022, EPA jointly awarded Micah 6:8 and four other organizations an Enhanced Air Quality Monitoring for Communities Competitive Grant under the 2021 American Rescue Plan. It used these funds to purchase, install, and operate two AQSync Air Quality Monitoring Stations manufactured by 2B Technologies. It installed one AQSync device in Sulphur, Louisiana which began operating in November 2024. The other is located just across the state line in Port Arthur, Texas. Those devices test for nitrogen oxides, carbon monoxide, particulate matter, ozone, and total VOCs (tVOC). That EPA grant requires Micah 6:8 to quarterly report its monitoring data from the AQSync for publication on EPA's website.

65.    Both AQSync and PurpleAir monitors contain sensors that do not use EPA-promulgated or EPA-approved methods for monitoring air pollutants. Micah 6:8 chose these devices specifically for their cost-effectiveness, ease of maintenance, and public accessibility.

66.    Micah 6:8 used to publish information about its monitoring results on its Facebook page. It also used to post different colored flags on its property, with each color symbolizing different air quality conditions based on Micah 6:8 monitoring. Following passage of CAMRA, Micah 6:8 has stopped both actions. It continues to collect data but is not comfortable sharing it anymore due to CAMRA's restrictions on dissemination and the hefty penalties it imposes for violations. Importantly, it is concerned with complying simultaneously with CAMRA and the terms of its EPA grant in conducting and reporting on its community air monitoring.

67.    If the court struck down CAMRA, Micah 6:8 would resume publishing its monitoring results.

68.    <u>The Descendants Project.</u> In June 2023, TDP installed a QuantAQ Modulair-PM—owned by Johns Hopkins University—to test for particulate matter at the Wallace, Louisiana café owned by its co-founders. It chose this pollutant because the nearby Atalco alumina refinery visibly emits it in the form of bright red bauxite dust. In February 2025, TDP collaborated with JHU researchers to station their mobile laboratory at the co-founders' property in Laplace to collect data. There, JHU tested for EtO, chloroprene, and other hazardous air pollutants and VOCs—pollutants that TDP knows nearby facilities emit.

69.    In April 2025, TDP collaborated with Colorado State University (CSU) graduate students by using AirPens to collect air samples in Laplace and Wallace. The AirPens continuously measure particulate matter and tVOC. Every week, TDP collects and ships the samples gathered by the AirPens to CSU, but it has not yet received results from this monitoring.

70.    The QuantAQ Modulair-PM and the mobile monitors used by JHU do not use FRM or FEM. Colorado State University's AirPen devices combine both EPA methods as well as low-cost sensors. Accordingly, disseminating data from these devices does not comply with CAMRA.

71.    TDP preserved a historic plantation building in Laplace as a museum and planned to create an exhibit that would continuously display their real-time air monitoring results. However, due to CAMRA, it has decided not to for fear of facing legal repercussions for unlawfully disseminating community air monitoring data.

72.    If the court struck down CAMRA, TDP would display real-time air monitoring results in their museum in Laplace.

73.    The Concerned Citizens of St. John Inc. To further its goal of making St. John Parish a better, safer place to live, CCSJ has historically published information on its website about PM$_{2.5}$, chloroprene, and EtO in the Parish. Specifically, it has cited EPA studies to raise awareness as to chloroprene and other pollution levels in the community. However, doing so has made CCSJ aware of gaps and flaws in air monitoring information that is publicly available. For example, when a naphtha tank at the nearby Garyville Marathon refinery caught fire in 2023, LDEQ repeatedly claimed there were no offsite impacts despite community members—including CCSJ—reporting chemical odors, and some individuals even being hospitalized.

74.    To fill that information gap and ensure the information's integrity, CCSJ partnered with another group which had received an EPA grant to monitor locally for PM$_{2.5}$, chloroprene, and EtO beginning in 2022 and extending until 2024. CCSJ stationed monitors in Reserve, Garyville, Vacherie, and Edgard, Louisiana that did not use EPA-approved or -promulgated methods.

75.    In February 2025, in coordination with CCSJ, JHU scientists stationed their mobile lab at the residence of CCSJ's founder. In doing so, CCSJ aimed to provide further public information as to the nearby Denka facility's pollution. The mobile lab was equipped with a suite of high-performance research-grade instruments that continuously measured concentrations of EtO and chloroprene, as well as other hazardous air pollutants and VOCs. These instruments are extremely sensitive, precise, and accurate, but they use monitoring methods that have not been approved or promulgated by EPA.

76.    In April 2025, CCSJ worked with CSU graduate students to place AirPen monitors in locations CCSJ wanted to test for PM and tVOC. CCSJ is hosting three monitors at members'

properties. Every week, CCSJ collects physical samples from the AirPens and ships them to CSU for analysis.

77.    Before CAMRA, CCSJ presented its monitoring results at bimonthly meetings—which it sometimes livestreamed on Facebook—pursuant to its mission of educating the community on local air pollution and health risks. But now, due to CAMRA, it has stopped doing so for fear of severe penalties.

78.    If the court struck down CAMRA, CCSJ would resume publicly sharing its monitoring results.

79.    <u>Claiborne Avenue Alliance Design Studio, Inc</u>. To further its work supporting community members in advocating for beneficial land use policies, Claiborne partnered with Louisiana State University (LSU) to conduct community air monitoring around the I-10 expressway. In 2023, Claiborne jointly received an EPA grant with LSU "to develop and evaluate a framework to facilitate sustainable community-led air testing (PM) campaigns." The EPA grant requires the recipients to purchase AirBeam PM monitors—a monitoring device that does not comply with CAMRA—using EPA grant funds. The grantees committed to provide an open-source database populated with the data collected. Claiborne has fulfilled these grant commitments since 2023 and thus operated AirBeam monitors to detect PM concentrations and shared information with community members and EPA regarding its findings.

80.    AirBeam monitors do not measure particulate matter using a method approved or promulgated by the EPA and therefore do not meet CAMRA's requirements. Claiborne chose these devices for the project because they are affordable and easy to use. They fit in the palm of the hand and can be used in conjunction with the smartphone AirCasting app, which automatically uploads the data to HabitatMap—an open source website where measurements are aggregated,

crowdsourced, mapped, and graphed in real-time every minute via internet connection. This allows the community to visualize areas where PM concentrations are highest and draw informed deductions about its causes and how to resolve them, which is vital to the mission of Claiborne and to its grant terms. AirBeams are also ideal for monitoring the expressway because they test for $PM_{2.5}$, which is a common pollutant associated with traffic.

81.    Claiborne used to publish information about its grant-funded monitoring results on its website. Following the passage of CAMRA, Claiborne asked its webmaster to hide that information out of concern that it could face legal consequences. But AirCasting continues to automatically upload the data to HabitatMap, even without any action on Claiborne Avenue Alliance's part. Claiborne is concerned that LDEQ will punish it under CAMRA for merely having these devices installed, though its EPA grant requires it to have those exact monitors and paid for Claiborne to purchase and use them. Claiborne seeks to meet its grant deliverables—including monitoring PM using the AirBeams, helping schools use the AirBeams, engaging the community on its findings, and reporting its results back to EPA. But CAMRA prohibits exactly what EPA authorized and funded Claiborne to accomplish—citizen science using affordable and publicly accessible monitoring devices.

82.    If the court enjoined enforcement of CAMRA, Claiborne would resume publishing its monitoring results on its website and otherwise sharing its findings.

83.    <u>JOIN for Clean Air.</u> JOIN began testing for $PM_{2.5}$ to fill in the gaps left by LDEQ's spotty monitoring of the greater New Orleans area. In July 2021, LDEQ responded to the hundreds of odor complaints for the area by installing a monitor in the Irish Channel neighborhood. However, after a year's data showed that the area had exceeded the annual fine particulate matter NAAQS, LDEQ removed the monitor. As a result, in April 2024, JOIN—with financial assistance

from the Center for Applied Environmental Science at the Environmental Integrity Project—bought and installed a Teledyne API Model T640 PM Mass Monitor, an instrument designated by EPA as an FEM, in the Irish Channel neighborhood at JOIN volunteers' residences.

84.    JOIN chose to use the Teledyne T640 because it wanted to evaluate whether air quality in its area is in attainment with the annual $PM_{2.5}$ NAAQS using an instrument that EPA and LDEQ agree is one of the most accurate instruments available to measure $PM_{2.5}$. If the data show that air quality is not attaining the national standard over a three-year period, JOIN would like to use the monitoring data to push back against the ways polluters in its area operate.

85.    Despite using an FEM method to monitor for air pollution, JOIN has decided not to publicly post its results out of fear of facing penalties if it fails to satisfy CAMRA's requirements on analyzing and disseminating monitoring data. Before JOIN was aware of CAMRA's restrictions and penalties, it engaged in individual conversations with community members about its monitoring results with the goal of raising awareness as to pollution from nearby industry and motivating advocacy. Now, it has stopped having such conversations, despite its core mission of public education and organizing for clean air.

86.    If the court struck down CAMRA, JOIN would begin publicly posting its monitoring results.

### CLAIMS FOR RELIEF

### First Cause of Action – Freedom of Speech
### (U.S. Const. amend. I, amend. XIV; 42 U.S.C. § 1983;
### Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)

87.    The First Amendment, which applies to Louisiana by operation of the Fourteenth Amendment, prohibits the state from abridging the freedom of speech.

88.    Plaintiffs are engaged in constitutionally protected speech when they collect, use, and disseminate air monitoring information.

89.    Section 2381.5 of CAMRA restricts Plaintiffs' speech by permitting them to collect air monitoring information using air sensors only if they do not use that information to allege a violation of, or noncompliance with, clean air laws based on the information they collect.

90.    Section 2381.6 of CAMRA restricts Plaintiffs' speech by preventing them from analyzing, and thus from disseminating to the public, monitoring data in the manner of their own choosing. Section 2381.6 also infringes on Plaintiffs' speech by compelling them to include an "quality assurance certification" as part of their dissemination of air monitoring analyses when they have not used a state-approved lab to conduct the analysis.

91.    Section 2381.9 of CAMRA simultaneously restricts and compels Plaintiffs' speech by requiring them to include "clear explanations" of air monitoring data when engaging in any "release or communication" of that data.

92.    Section 2381.10 of CAMRA imposes restrictions on the use of Plaintiffs' air monitoring data in enforcement actions that do not apply to air monitoring data obtained from sources other than community groups.

93.    CAMRA attaches liability based on the content or viewpoint of Plaintiffs' speech.

94.    CAMRA imposes restrictions on Plaintiffs' speech that do not apply to other speakers, such as industry participants, that collect, use, and disseminate air monitoring information. CAMRA thus relies on speaker-based distinctions to regulate speech.

95.    Louisiana lacks a legitimate compelling interest in restricting Plaintiffs' speech in the manner that CAMRA does. Louisiana has not tailored CAMRA to achieve a legitimate state interest.

96.    CAMRA has a chilling effect on speech. Plaintiffs have refrained and must refrain from engaging in constitutionally protected speech to avoid the risk of liability, including crippling civil penalties.

97.    Because CAMRA violates Plaintiffs' freedom of speech, Plaintiffs are entitled to declaratory and injunctive relief to bar Defendants from enforcing CAMRA's restrictions against them.

**Second Cause of Action – Right to Petition**
**(U.S. Const. amend. I, amend. XIV; 42 U.S.C. § 1983;**
**Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)**

98.    The First Amendment, which applies to Louisiana by operation of the Fourteenth Amendment, prohibits the state from restricting the right to petition for redress of grievances.

99.    The right to petition encompasses the right to seek redress from executive agencies and the courts.

100.    Sections 2381.5, 2381.6, 2381.9, and 2381.10 of CAMRA make it unlawful for Plaintiffs to use and disclose monitoring data and analysis that do not comply with CAMRA's requirements in connection with seeking redress from EPA and LDEQ for violations of clean-air laws.

101.    Sections 2381.5, 2381.6, 2381.9, and 2381.10 of CAMRA make it unlawful for Plaintiffs to use and disclose monitoring data and analysis that do not comply with CAMRA's requirements in connection with seeking redress from the courts for violations of clean-air laws.

102.    To avoid the risk of liability, including crippling civil penalties, Plaintiffs must refrain from petitioning EPA, LDEQ, or courts using monitoring data and analyses that do not comply with CAMRA's requirements.

103.    Because CAMRA violates Plaintiffs' right to petition, Plaintiffs are entitled to declaratory and injunctive relief to bar Defendants from enforcing CAMRA's restrictions against them.

**Third Cause of Action – Preemption**
**(42 U.S.C. § 1983; Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202)**

104.    Under the Supremacy Clause, state laws that conflict with federal laws are preempted.

105.    Section 2381.5 effectively prevents community groups from conducting air monitoring using air sensors. Section 2381.5 conflicts with the Clean Air Act and EPA's efforts under the Clean Air Act, the ARP, and the IRA to promote more widespread use of community air monitoring through deployment of air sensors.

106.    Sections 2381.5, 2381.6, 2381.9, and 2381.10 restrict Plaintiffs' ability to share air monitoring information with EPA to support research and enforcement actions. These CAMRA provisions conflict with Clean Air Act provisions that authorize EPA to bring enforcement actions based on "any information available" about potential violations of emissions standards and that reward persons that furnish information to EPA for information that result in successful enforcement actions. 42 U.S.C. § 7413(a), (b), (d), (f).

107.    Sections 2381.5, 2381.6, 2381.9, and 2381.10 restrict the ability of community groups to use air monitoring data and analyses that do not comply with CAMRA's requirements in citizen suits under the Clean Air Act. They also prevent community groups from satisfying the requirement that prior notice of a violation be provided to EPA and the state before the filing of such a suit. CAMRA conflicts with the Clean Air Act by restricting community groups' ability to invoke a federal cause of action against polluting entities, as contemplated by the citizen suit provision of the Clean Air Act.

108.    Because CAMRA conflicts with federal law, Plaintiffs are entitled to declaratory and injunctive relief to bar Defendants from enforcing CAMRA's requirements against them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and grant the following relief:

(a) Declare, pursuant to 28 U.S.C. § 2201, that enforcement of CAMRA violates the Plaintiffs' rights to free speech under the U.S. Constitution;

(b) Declare, pursuant to 28 U.S.C. § 2201, that enforcement of CAMRA violates the Plaintiffs' right to petition under the U.S. Constitution;

(c) Declare, pursuant to 28 U.S.C. § 2201, that CAMRA is preempted by the Clean Air Act;

(d) Preliminarily and permanently enjoin Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from enforcing CAMRA against Plaintiffs, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them;

(e) Award Plaintiffs such costs as are incurred in prosecuting this action, including reasonable attorneys' fees;

(f) Grant such other and further relief as the Court may deem just and proper.

May 22, 2025

Respectfully submitted,

/s/ Caitlion O'Neill
Caitlion O'Neill
(LA Bar No. 40566)
RISE St. James Louisiana
2150 Allston Way
Suite 460
Berkeley, CA 94704
(504) 321-1360
chunter@risestjames.org

David Bookbinder
(D.C. Bar. No. 455525)
Environmental Integrity Project
888 17th Street NW
Washington, DC 20006
(301) 751-0611
dbookbinder@environmetalintegrity.org
*pro hac vice application pending*

Mariah Harrod
(TX Bar No. 24143847)
Environmental Integrity Project
888 17th Street NW
Washington, DC 20006
(856) 503-8645
mharrod@environmetalintegrity.org
*pro hac vice application pending*

Nandan M. Joshi
(DC Bar. No. 456750)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-7733
njoshi@citizen.org
*pro hac vice application pending*