UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| RISE ST. JAMES LOUISIANA, MICAH SIX EIGHT MISSION, THE DESCENDANTS PROJECT, THE CONCERNED CITIZENS OF ST. JOHN INC., CLAIBORNE AVENUE ALLIANCE DESIGN STUDIO, INC., and JOIN FOR CLEAN AIR,<br><br>        Plaintiffs,<br><br>        v.<br><br>COURTNEY J. BURDETTE, in her official capacity as Secretary of the Louisiana Department of Environmental Quality; JERRY LANG, in his official capacity as Assistant Secretary for Environmental Compliance at the Louisiana Department of Environmental Quality; and LIZ MURRILL, in her official capacity as Attorney General of Louisiana,<br><br>        Defendants. | Case No. 3:25-cv-00429-JWD-RLB |

**DECLARATION OF AMY STELLY**

I, Amy Stelly, declare the following based on personal knowledge to which I am competent to testify:

1. I am the Executive Director of Claiborne Avenue Alliance Design Studio, Inc. ("Claiborne") and have served in this role since Claiborne incorporated in 2022. As the Executive Director of the design studio, I am the chief urban designer for community projects, manage grant deliverables, apply for grants, and generally run the nonprofit. Accordingly, I am familiar with the objectives, programs, and structure of Claiborne.

2. Claiborne is a 501(c)(3) nonprofit incorporated in Louisiana. Its mailing address is 1821 Dumaine Street, New Orleans, Louisiana 70116.

1

3. Claiborne is the incorporated design studio born out of the advocacy work of the Claiborne Avenue Alliance: a coalition of residents, property and business owners formed in 2017. That coalition is dedicated to the thoughtful development of the Claiborne Corridor, the area affected by the elevated I-10 expressway along Claiborne Avenue—an expressway we believe was located here to punish and physically separate the Black community living in the Corridor in the 1960s. Before the expressway cut through the predominantly Black neighborhood of Treme, Claiborne Avenue hosted more than one hundred businesses. Now, only a few businesses remain. The expressway's significant traffic, noise, air pollution, and concrete structures prevent pedestrian use and degraded community spaces. The coalition aimed to empower community members to successfully advocate for use of the space that would actually benefit them.

4. When we incorporated in 2022, we sought to further that mission of making safe, healthy, and enjoyable spaces beyond the Claiborne Corridor. We incorporated in part to apply for a grant under the federal Reconnecting Communities Pilot program. Our application sought to remove parts of the expressway, but our application was denied; instead, the federal government accepted a much costlier grant application from the City of New Orleans and State of Louisiana to simply repair the expressway and attempt to build a marketplace beneath it. But who would want to spend time shopping under a noisy, dirty expressway? Community members know that this is not a smart or cost-effective use of taxpayer funds. These decisions must be left to community members, and community members must be empowered to make these decisions. That's why we created Claiborne.

5. Claiborne is a community-based, nonprofit architectural and urban design firm committed to increasing access to community-based architecture and urban design. Our design

and planning services include building and open space design, historic restoration, downtown and neighborhood revitalization, environmental planning, zoning, entitlements, site planning, and streetscape and landscape design. For example, we recently wrote land use policy suggestions for The Descendants Project to offer to local lawmakers as an alternative to a proposed grain elevator that would have produced dangerous particulate matter and water pollution.

6.    To further our work of empowering community members to make smart land use decisions for their community, Claiborne has partnered with Dr. Adrienne Katner at Louisiana State University ("LSU") to conduct air monitoring around Claiborne Avenue. Dr. Katner is an environmental scientist whose father was the city planning director when the expressway was built but who eventually regretted its impact on Treme and the 7th Ward. In 2023, Claiborne and Dr. Katner, through LSU, jointly applied for and received an EPA grant for which the primary goal is "to develop and evaluate a framework to facilitate sustainable community-led air testing (PM) campaigns, intergenerational learning and deliberative community engagement . . . preserve a cultural history, enable informed decision-making, and foster strategic political collective action on the fate of the I-10, by a culturally significant, yet politically disenfranchised New Orleans neighborhood."[1] The grant requires Claiborne and Dr. Katner to purchase AirBeam particulate matter monitors with grant funds and to provide the AirBeams "freely to schools or teachers who wish to implement associated lesson plans."[2] The project deliverables for the EPA grant expressly include citizen science lesson plans, an air monitoring campaign, and an "open source database populated with PM data."[3] Through the terms of the grant, Claiborne is

---

[1] U.S. Env't Prot. Agency, Grant Agreement—Claiborne Reborn: Inpowering Treme through a Multi-Generational Campaign of Citizen Science, Cultural Preservation, and Deliberative Community at 4 (Sept. 11, 2023) (attached as Exhibit 1).
[2] *Id.*
[3] *Id.*

responsible for community outreach and project reports. We currently have four AirBeams around the Corridor. One of the monitors is on my house. Another is a couple blocks away on the house of a state representative who agreed to host the monitoring device. Others are similarly placed throughout the Corridor.

7. Claiborne believes that community members' voices will be amplified to decisionmakers when community members are armed with data from air quality monitoring devices. While some pollution data for the Corridor exists, that data is mostly inaccessible to laypeople. To that end, Dr. Katner chose AirBeams—a monitoring device that does not comply with Louisiana's Community Air Monitoring Reliability Act ("CAMRA")—for the monitoring project because AirBeams are cheap and fairly easy to use. They fit in the palm of your hand and can be used in conjunction with the smartphone AirCasting app, which casts the data to HabitatMap—an open-source website where measurements are aggregated, crowdsourced, mapped, and graphed in real-time every minute via internet connection. This allows the community to visualize areas where particulate matter concentrations are highest and draw informed deductions about its causes and how to resolve them. AirBeams also test for fine particulate matter, which is a common pollutant associated with traffic and known to cause health issues related to respiratory and reproductive processes. Particulate matter is a criteria pollutant subject to the National Ambient Air Quality Standards ("NAAQS"), so our monitoring is also intended to inform us whether our area complies with federal law. That knowledge will then inform our advocacy efforts and whether we pursue any legal action.

8. We used to publish information about the monitoring results on our website. Following the passage of CAMRA, I have asked our webmaster to hide that information out of concern that Claiborne could face legal consequences. But AirCasting continues to automatically

upload the data to HabitatMap, even without any action on our part. We are concerned that CAMRA will punish us for merely having these devices installed, though our EPA grant requires us to have them and even paid for us to purchase and use them. We have been trying to strike a balance between meeting our grant deliverables—including monitoring particulate matter using the AirBeams, helping schools use air monitoring devices they otherwise would not have access to, engaging the community on our findings, and reporting our results back to EPA—and complying with CAMRA. I don't think we can do both. CAMRA prohibits exactly what EPA authorized and funded us to accomplish—citizen science using affordable and publicly accessible monitoring devices.

9. If the court ruled that CAMRA was illegal, Claiborne would resume publicizing the results of our monitoring and potentially use those results in litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 7th day of August 2025 in New Orleans, Louisiana.

_____
Amy Stelly, Executive Director
Claiborne Avenue Alliance Design Studio, Inc.

5

# Exhibit 1

5X - 02F28101 - 0    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br>Grant Agreement | GRANT NUMBER (FAIN): 02F28101<br>MODIFICATION NUMBER: 0<br>PROGRAM CODE: 5X | DATE OF AWARD<br>09/11/2023 |
|---|---|---|---|
| | | TYPE OF ACTION<br>New | MAILING DATE<br>09/14/2023 |
| | | PAYMENT METHOD:<br>ASAP | ACH#<br>PEND |

| RECIPIENT TYPE:<br>Not for Profit | Send Payment Request to:<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:**<br>LSU Health Foundation New Orleans<br>2000 Tulane Avenue FL 4<br>New Orleans, LA 70112-2250<br>EIN: 72-1115391 | **PAYEE:**<br>LSU Health Foundation New Orleans<br>2000 Tulane Avenue FL 4<br>New Orleans, LA 70112-2250 |

| PROJECT MANAGER | EPA PROJECT OFFICER | EPA GRANT SPECIALIST |
|---|---|---|
| Dr. Adrienne Katner<br>2020 Gravier St.,<br>New Orleans, LA 70112<br>Email: akatn1@lsuhsc.edu<br>Phone: 504-568-5942 | Nina Evans<br>1201 Elm Street, Ste 500, ARD<br>Dallas, TX 75270-2102<br>Email: evans.nina@epa.gov<br>Phone: 214-665-8568 | Anedia Feaster<br>Office of Mission Support, MSDCA<br>1201 Elm Street, Ste 500<br>Dallas, TX 75270-2102<br>Email: Feaster.Anedia@epa.gov<br>Phone: 214-665-2267 |

**PROJECT TITLE AND DESCRIPTION**

Claiborne Reborn: Inpowering Treme through a Multi-Generational Campaign of Citizen Science, Cultural Preservation, and Deliberative Community

See Attachment 1 for project description.

| BUDGET PERIOD<br>08/01/2023 - 07/31/2026 | PROJECT PERIOD<br>08/01/2023 - 07/31/2026 | TOTAL BUDGET PERIOD COST<br>$498,480.00 | TOTAL PROJECT PERIOD COST<br>$498,480.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 03/24/2022 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $498,480.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $498,480.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| U.S. EPA, Region 6, Grants Management Section<br>1201 Elm Street, Suite 500<br>Dallas, TX 75270-2102 | U.S. EPA, Region 6, Air and Radiation Division<br>R6 - Region 6<br>1201 Elm Street, Ste 500<br>Dallas, TX 75270-2102 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| Digital signature applied by EPA Award Official   Christopher Watkins - Grant Management Officer | DATE<br>09/11/2023 |
|---|---|

5X - 02F28101 - 0    Page 2

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $0 | $498,480 | $498,480 |
| EPA In-Kind Amount | $0 | $0 | $0 |
| Unexpended Prior Year Balance | $0 | $0 | $0 |
| Other Federal Funds | $0 | $0 | $0 |
| Recipient Contribution | $0 | $0 | $0 |
| State Contribution | $0 | $0 | $0 |
| Local Contribution | $0 | $0 | $0 |
| Other Contribution | $0 | $0 | $0 |
| Allowable Project Cost | $0 | $498,480 | $498,480 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.034 - Surveys-Studies-Investigations-Demonstrations and Special Purpose Activities relating to the Clean Air Act | Clean Air Act: Sec. 103 | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

## Fiscal

| Site Name | Req No | FY | Approp. Code | Budget Oganization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
|---|---|---|---|---|---|---|---|---|---|
| - | 2306JSR044 | 2231 | E1SFX | 06J2 | 000AMTXM1 | 4183 | - | - | $498,480 |
| | | | | | | | | | $498,480 |

5X - 02F28101 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---:|
| 1. Personnel | $7,331 |
| 2. Fringe Benefits | $2,443 |
| 3. Travel | $0 |
| 4. Equipment | $0 |
| 5. Supplies | $0 |
| 6. Contractual | $0 |
| 7. Construction | $0 |
| 8. Other | $488,706 |
| 9. Total Direct Charges | $498,480 |
| 10. Indirect Costs: 0.00 % Base | $0 |
| 11. Total (Share: Recipient __0.00 % Federal 100.00 %) | $498,480 |
| 12. Total Approved Assistance Amount | $498,480 |
| 13. Program Income | $0 |
| 14. Total EPA Amount Awarded This Action | $498,480 |
| 15. Total EPA Amount Awarded To Date | $498,480 |

5X - 02F28101 - 0    Page 4

## *Attachment 1 - Project Description*

The agreement provides conduct ambient air monitoring of pollutants of greatest concern in communities with environmental and health outcome disparities stemming from pollution and the COVID-19 pandemic.

The primary goal is to develop and evaluate a framework to facilitate sustainable community-led air testing (PM) campaigns, intergenerational learning and deliberative community engagement to "inpower" communities (inpowerment begins internally, whereas empowerment begins externally), preserve a cultural history, enable informed decision-making, and foster strategic political collective action on the fate of the I-10, by a culturally significant, yet politically disenfranchised New Orleans neighborhood.

Students will collect PM concentration data along the I-10 and in neighborhoods adjoining the I-10 using AirBeam PM air monitors (Figure 4). AirBeams will be purchased and held in a community monitoring equipment "lending library" and provided freely to schools or teachers who wish to implement associated lesson plans. The AirBeam PM monitor is a low-cost hand-sized mobile air quality instrument that measures hyperlocal concentrations of (PM1,2.5,10, humidity, temperature and sound levels). When used in conjunction with the smartphone AirCasting app, these data are then cast to HabitatMap, an open source website where measurements are aggregated, crowdsourced, mapped and graphed in real-time every minute via WiFi or cellular network (Figure 4). This allows the community to visualize areas where PM concentrations are highest to inform decision-making. Students will interpret and translate results. This curriculum was highlighted by the American Academy for the Advancement of Science (AAAS) for the creative ways children found to communicate results; while Dateline ABC filmed our monitoring event with Homer Plessy 1st grade students for an upcoming special on highway impacts on minority communities (Figure 4).

Historical Documentation: Students will document the experiences of a dying Creole culture through interviews and videos of elderly residents who still remember Treme before the I-10, and who can speak to the impacts it had on the economy, environment, health, culture and community. These individuals are over 60 years old now, so it is important to record their experiences to reinvigorate a community resigned to an inequitable fate, and to inspire younger

The anticipated deliverables include.

Project Outputs: 1) citizen science lesson plans; 2) deliberative community engagement toolkit; 3) monitoring tool "lending library". 4) air monitoring campaign and open source database populated with PM data; 5) health assessment; 6) student outreach materials and products; 7) deliberative community engagement events; and 8) consensus report for stakeholders and policy-makers, potential solutions, funding sources, recommendations, and next steps.

Project Outcomes: 1) greater community buy-in; 2) informed and evidence-wielding community to ensure decisions are considerate of the public's health; and 3) motivated and

empowered students and residents with the confidence and skills to conduct citizen science; and ultimately, 4) redress for a community impacted by a grave environmental injustice, which will manifest as improved environmental quality, resident health, and recovery of the economy and culture.

4-B. Performance Measures and Plan

The evaluation team will conduct formative, summative and process analyses to evaluate, refine and influence strategic impact. Partners will work to formalize a strategic framework, guidance documents, lesson plans, toolkit and monitor lending library, which will support independent implementation of similar campaigns by other communities and schools. Table 3 presents the timeline of major activities by each partner and their major milestones and deliverables.

The expected outcomes include .Project Outputs include: 1) citizen science lesson plans; 2) deliberative community engagement toolkit for residents to facilitate unbiased resident representation, informed deliberations and decision-making, and strategic political planning and campaigning; 3) monitoring tool "lending library", all of which aim to engage locals in air monitoring, science translation, and community-led policy campaigns. 4) Citizen science air monitoring campaign and open source database populated with community-collected particulate matter (PM) data around the I-10; 5) health assessment of the I-10 neighborhood; 6) student outreach materials and products to inform policies, educate stakeholders and reduce exposures as; 7) I-10 deliberative community engagement events to build community consensus on plans for the I-10 (repair, repurpose or remove); and 8) summary report, presentations and flyers for stakeholders and policy-makers on consensus on the fate of the I-10, potential solutions and funding sources, policy recommendations, and next steps.

Project Outcomes expected include: 1) greater community buy-in for more equitable decision-making; 2) informed and evidence-wielding community to ensure decisions are considerate of the public's health; and 3) motivated and empowered students and residents with the confidence and skills to conduct citizen science projects and engage in community-led campaigns for the purpose of informing and influencing policies; and ultimately, 4) redress for a community long impacted by a grave environmental injustice, which will manifest as neighborhood improvements in environmental quality, resident health, and recovery in terms of the community's economy and culture.

Primary Outputs and Outcomes include: 1) air monitoring and traffic-associated pollution lesson plans, 2) deliberative community engagement events, 3) free air monitor "lending library"; 4) online maps of PM levels and science translation materials; 5) community consensus report; 6) community buy-in; 7) informed and empowered citizens; 8) motivated, skilled and confident students; and 9) redress for environmental injustice manifesting in community health and healing.

The intended beneficiaries include. Three subawards are included in this assistance agreement.

#1- LSU School of Public Health- is responsible for grants, budget, and contracts oversight,

5X - 02F28101 - 0   Page 6

management and reporting (in conjunction with LSU-SPH). • LSU Foundation is responsible for the following deliverables: 1) subcontracts and reports (in conjunction with LSU-SPH). LSU Health will facilitate post-award grant management responsibilities including fiscal tasks such as maintaining compliant recordkeeping, timely payment of invoices and subawards. The Director of Grants will perform subrecipient reviews for compliance and participate in partner meetings as a compliance resource.

#2 -Claiborne Ave Alliance - ) is responsible managing all deliberative community engagement and community planning events; primary and secondary school and student engagement; community outreach; and oversight of ACV activities and contract. • CAA will be responsible for the following deliverables: 1) deliberative community engagement toolkit; 2) student products and historical documentation; 3) community outreach materials; and 4) project interim and summary reports (in association with LSU-SPH).

#3- A Community Voice - is responsible for community recruitment, meeting facilitation, and community surveys. • ACV will be responsible for the following deliverables: 1) community recruitment materials, and 2) a community feedback report.

5X - 02F28101 - 0    Page 7

## **Administrative Conditions**

### A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at:
https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2022-or-later.

These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award.

The EPA repository for the general terms and conditions by year can be found at:
https://www.epa.gov/grants/grant-terms-and-conditions#general.

### B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA. Unless otherwise noted, all such correspondence should be sent to the following email addresses:

• Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and (GS) Anedia Feaster, feaster.anedia@epa.gov, (214) 665-2267, R6_EPA_Grants_Programs@epa.gov

• MBE/WBE reports (EPA Form 5700-52A): Debora Bradford, bradford.debora@epa.gov, (214) 665-7406, (GS) Anedia Feaster, feaster.anedia@epa.gov, (214) 665-2267, R6_EPA_Grants_Programs@epa.gov

• All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: (GS) Anedia Feaster, feaster.anedia@epa.gov, (214) 665-2267, R6_EPA_Grants_Programs@epa.gov, (PO) Nina Evans, evans.nina@epa.gov, (214) 665-8568

• Payment requests (if applicable):rtpfc-grants@epa.gov

• Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: (PO) Nina Evans, evans.nina@epa.gov, (214) 665-8568

### C. Pre-Award Costs

In accordance with 2 CFR 1500.9, the recipient may charge otherwise allowable pre-award costs (both Federal and non-Federal matching shares) incurred from 8/01/2023 to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period.

### D. Pre-Award Administrative Capability (Added 5/19/2023)

Louisiana State University Health Foundation's pre-award certification review was initiated, but is not completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial managment systems to be completed **prior** to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, Louisiana State University Health Foundation is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results.

5X - 02F28101 - 0    Page 8

Please note, any costs incurred prior to EPA approval are at Louisiana State University Health Foundation's own risk. If Louisiana State University Health Foundation fails to respond or is unable to satisfactorily address all identified deficiences within 90 days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## *Programmatic Conditions*

## Grant-Specific Programmatic Terms and Conditions (as of 2/01/2023)

### A. PERFORMANCE REPORTING AND FINAL PERFORMANCE REPORT

#### Performance Reports

In accordance with 2 CFR 200.329, the recipient agrees to submit performance reports that include brief information on each of the following areas: 1) A comparison of actual accomplishments to the outputs/outcomes established in the assistance agreement work plan for the period; 2) The reasons why established outputs/outcomes were not met; and 3) Additional pertinent information, including, when appropriate, analysis and explanation of cost overruns or high-unit costs.

Additionally, the recipient agrees to inform EPA as soon as problems, delays, or adverse conditions which will materially impair the ability to meet the outputs/outcomes specified in the assistance agreement work plan are known.

(See Grants Policy Issuance 11-03 State Grant Workplans and Progress Reports for more information)

#### Performance Reports - Frequency

The recipient agrees to submit **quarterly** performance reports electronically to the EPA Project Officer within 30 days after the quarterly reporting period ends on June 30th, 2023,. The recipient must submit the final performance report no later than 120 calendar days after the end date of the period of performance.

#### Subaward Performance Reporting

The recipient must report on its subaward monitoring activities under 2 CFR 200.332(d). Examples of items that must be reported if the pass-through entity has the information available are:

1. Summaries of results of reviews of financial and programmatic reports.

2. Summaries of findings from site visits and/or desk reviews to ensure effective subrecipient performance.

3. Environmental results the subrecipient achieved.

4. Summaries of audit findings and related pass-through entity management decisions.

5. Actions the pass-through entity has taken to correct deficiencies such as those specified at 2 CFR 200.332(e), 2 CFR 200.208 and the 2 CFR Part 200.339 Remedies for Noncompliance.

Note: EPA Project Officers may customize this reporting requirement based on programmatic information needs.

### B. Data Reporting

5X - 02F28101 - 0    Page 9

Data and/or related observations must be shared publicly and in a practicable amount of time throughout the lifetime of the project and not only after the project is at or near completion.

### C. Cybersecurity Condition

**Cybersecurity Grant Condition for Other Recipients, Including Intertribal Consortia**

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer (PO) no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

### D. Competency Policy

**Competency of Organizations Generating Environmental Measurement Data**

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements,

Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

### E. Quality Assurance (Updated 01/31/2023)

**Instructions:** Refer to the instruction or option selections shown in red with grey highlight and edit to support the

**sponsoring EPA organization's implementation of the Agency's graded approach.**

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure sub-award recipients develop and implement [a/the] Quality Assurance (QA) planning document[s] in accordance with this term and condition; and/or ensure sub-award recipients implement all applicable approved QA planning documents.

**Quality Management Plan (QMP)** (When required, select an Option for clause a.)

a. Prior to beginning environmental information operations, the recipient must:

Option 1

i. Develop a QMP,

ii. Prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

**OR**

Option 2:

i. Submit a previously EPA-approved and current QMP,

ii. The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

b. The recipient must submit the QMP within [Insert, e.g., 30/60/90] days after grant award, and/or no more than [Insert, e.g., 90/120/180] days after grant award.

(QAM may specify both timeframes or specify only one timeframe and remove the other.)

c. The recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.  (QAM or PO may add another specification).

d. The recipient must submit a QMP crosswalk with the QMP. (Remove if not required) (If this item remains, attach and/or include the link in For Reference.)

**2. Quality Assurance Project Plan (QAPP)** (Select an Option for clause a.)

a. Prior to beginning environmental information operations, the recipient must:

5X - 02F28101 - 0    Page 11

Option 1

i. Develop a QAPP,

ii. Prepare QAPP in accordance with the current version of EPA QA/R-5: EPA Requirements for Quality Assurance Project Plans,

iii. Submit the document for EPA review, and

iv. Obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval.

Option 2

i. Submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s).

ii. The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

Option 3

i. Provide EPA a copy of the recipient-approved QAPP if the recipient has an EPA-approved Quality Management Plan and a current EPA delegation to review and approve QAPPs.

b. The recipient must submit the QAPP [Insert, e.g., 30/60/90] days after grant award, and/or no more than [Insert, e.g., 90/120/180] days after grant award.
(QAM may specify both timeframes or specify only one timeframe and remove the other.)

c. The recipient shall notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

d. The recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur (QAM or PO may add additional specifications).

e. The recipient must submit a QAPP [crosswalk, checklist] with the QAPP. (Remove if not required). (If this item remains, attach and/or include the link in For Reference.)

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA QA/R-5: *EPA Requirements for Quality Assurance Project Plans*; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*, Appendix C provides a QAPP Checklist.

• (QAM and/or PO may insert QA references that inform or assist the recipient here).

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

F. EQUIPMENT DISPOSITION

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient must request disposition instructions from the EPA Project Officer Disposition instructions will be one of the following:

(1) Items of equipment with a current per unit fair market value of $5,000 or less may be retained, sold or otherwise disposed of with no further obligation to the EPA.

(2) Except as provided in 2 CFR 200.312 Federally-owned and exempt property, paragraph (b), or if EPA fails to provide requested disposition instructions within 120 days, items of equipment with a current per-unit fair-market value in excess of $5,000 may be retained by the recipient or sold. EPA is entitled to an amount calculated by multiplying the current market value or proceeds from sale by EPA's percentage of participation in the cost of the original purchase. If the equipment is sold, EPA may permit the recipient to deduct and retain from the Federal share $500 or ten percent of the proceeds, whichever is less, for its selling and handling expenses.

(3) The recipient may transfer title to the property to the Federal Government or to an eligible third party provided that, in such cases, the recipient must be entitled to compensation for its attributable percentage of the current fair market value of the property.

(4) In cases where a recipient fails to take appropriate disposition actions, EPA may direct the recipient to take disposition actions.

G. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the [Insert Recipient or subrecipient NAME] received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy

H. DURC/iDURC

The recipient agrees to not initiate any life sciences research involving agents and toxins identified in Section 6.2.1 of the United States Government Policy for Institutional Oversight of Life Sciences Dual Use Research of Concern (iDURC Policy) until appropriate review and clearance by the recipient institution's Institutional Review Entity (IRE). The recipient also agrees to temporarily suspend life sciences research in the event that, during the course of the research project, the IRE determines that the life sciences research meets the definition of DURC in the iDURC Policy, and the recipient agrees to notify the EPA Institutional Contact for Dual Use Research (ICDUR) (DURC@epa.gov) of the institution's determination.