EXHIBIT 1

TO

DECLARATION OF NANDAN M. JOSHI



# REPORT:

## LOUISIANA SENATE CONCURRENT RESOLUTION 30

TO STUDY IMPLEMENTATION OF REAL-TIME COMMUNITY AIR MONITORING AND NOTIFICATION SYSTEMS

*PREPARED BY THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY*



# Table of
# CONTENTS

Preamble ......................................... 3

Executive Summary ......................... 4

Task Force ....................................... 5

Effectiveness of Real-time Air
Monitoring and Notification Systems ... 6

Associated Costs for Notification
Systems .......................................... 13

Air Pollutants and Public Health ....... 18

Recommendations ........................... 22

Attachments .................................... 23

# PREAMBLE

## SENATE CONCURRENT RESOLUTION 30

Senate Concurrent Resolution 30 (SCR 30), which can be read in *Attachment A*, was adopted during the 2024 Regular Legislative Session of the Louisiana State Legislature.

The Resolution requests that a Task Force be created to study the implementation of real-time community air monitoring and notification systems, specifically the costs and benefits of implementation of such systems in communities disproportionately impacted by the negative affects of air pollution.

The Task Force was directed to submit this written report outlining their efforts by February 15, 2025, to the Senate Committee on Environmental Quality and the House Committee on Natural Resources and Environment.



# EXECUTIVE  SUMMARY

SCR 30, adopted during the 2024 Regular Legislative Session of the Louisiana State Legislature, created the *Community Air Monitoring and Notification System Task Force* to study the feasibility, costs, and implementation of community air monitoring and notification systems in Louisiana. This report outlines the findings and efforts of the Task Force, fulfilling the requirement to submit a written report to the Senate Committee on Environmental Quality and the House Committee on Natural Resources and Environment.

The report begins by providing the legislative context and objectives of SCR 30, detailed in *Attachment A*. It describes the role of the Task Force in evaluating real-time air monitoring systems, including their potential to detect and communicate air quality exceedances to impacted communities. Key considerations include analyzing existing regulatory frameworks, current monitoring technologies, and the infrastructure needed to implement and maintain these systems statewide.

The report details the cost analysis of implementing such systems, including estimates of initial equipment costs, ongoing operational expenses, and personnel requirements, informed by current air monitoring operations at facilities. Specific costs associated with regulatory-grade monitors, simpler air sensors, and notification systems capable of delivering real-time alerts to communities are outlined in detail (*Air sensors:* a method of referring to a class of technology for devices that can directly read a pollutant in the air and are lower in cost, portable and generally easier to operate than regulatory-grade monitors).

Additionally, the report examines the potential integration of simpler sensor technologies as sentinel systems, their role in complementing regulatory-grade monitors, and how they can enhance community coverage, with an emphasis on the importance of public involvement and transparency in siting decisions to build trust and foster community support.

Finally, the report includes actionable recommendations for legislative or regulatory changes necessary to implement a system effectively. These include potential phased approaches, prioritization of sites, and public engagement initiatives. Attachments provide supporting materials, such as the full text of SCR 30, an inventory of Title V facilities, relevant cost estimates, and technical references for air monitoring technologies.

This report represents a comprehensive evaluation of the challenges, opportunities, and pathways for establishing a Community Air Monitoring and Notification System in Louisiana, as requested by SCR 30. Its findings and recommendations aim to guide the Legislature in making informed decisions to protect public health and improve air quality across the State.

# TASK FORCE

**Senate Concurrent Resolution 30:** To create the Community Air Monitoring and Notification Task Force to study the implementation of real-time community air monitoring and notification systems for emission sources.

**BE IT FURTHER RESOLVED** that the Task Force shall submit a written report of its findings, conclusions, and recommendations to the House Committee on Natural Resources and Environment and the Senate Committee on Environmental Quality on or before February 15, 2025



# MEMBERSHIP

Secretary Aurelia S. Giacometto, Louisiana Department of Environmental Quality, Chair Ms. Shannon Soileau, Louisiana Department of Health
Mr. Neal McMillin, Louisiana Department of Energy and Natural Resources
Representative Alonzo Knox, Louisiana House of Representatives
Representative Kim Coates, Louisiana House of Representatives
Senator Patrick Connick, Louisiana Senate
Mr. Bodi White, Louisiana Senate (Former)
Mr. Damien Watt, Louisiana Mid-Continent Oil and Gas Association
Mr. Douglas Melancon, Louisiana Chemical Association
Ms. Lindsey Cooper Philips, Clean Air Task Force
Ms. Kathy Wascom, Louisiana Environmental Action Network

5

# Effectiveness of Real-Time Community Air Monitoring and Notification Systems

***What is Community Air Monitoring?***

Community air monitoring involves the systematic process of measuring and reporting air quality in a specific area, typically near facilities that are major sources of air pollutants. This includes the use of real-time monitoring equipment to track parameters that may vary based on the size and scope of the facility being monitored. Proven and verifiable regulatory-grade monitors, such as Federal Reference Method (FRM) or Federal Equivalent Method (FEM) monitors, are employed to ensure the accuracy and reliability of the data collected.

FRMs are designed to provide the most fundamentally sound and scientifically defensible concentration measurements for criteria pollutants. FRMs serve as the basis of comparison upon which to judge other measurement methods. FEMs provide a comparable level quality as compared to FRMs, and may include newer, innovative technologies to reduce overall operating cost and to achieve multiple monitoring objectives. For example, FEMs may be used to provide timely public health advisories. EPA conducts technical and administrative reviews of new candidate FRMs and FEMs for approval.



6

***Community Air Monitoring Reliability Act***

The primary purpose of community air monitoring is to provide accurate and timely information about air quality to surrounding communities, fostering transparency and promoting public health. In Louisiana, the Community Air Monitoring Reliability Act, signed into law (See 2024 Regular session, Act 181, SB 503) by Governor Landry, establishes clear standards for non-governmental entities to conduct air quality monitoring.

The Community Air Monitoring Reliability Act was created to establish standards for monitoring programs to ensure public access to accurate air quality information and requires that equipment, software, and methods for data collection and analysis use current EPA-approved testing and monitoring methods.

This legislation includes provisions for:
- Collecting data on pollutants that meet National Ambient Air Quality Standards (NAAQS).
- Considering actions to address potential noncompliance with NAAQS.
- Requiring monitoring entities to provide clear and accessible explanations of their findings and data to the public.

By utilizing EPA-regulated equipment and adhering to established protocols, community air monitoring ensures that residents have access to reliable air quality information while supporting compliance with environmental standards. This collaborative approach helps to maintain cleaner air and safeguard public health across Louisiana.

*Types of Air Monitors and Sensors*

Community air monitoring employs two primary types of equipment: **air sensors** and **regulatory monitors**, each serving distinct purposes and offering varying levels of accuracy and precision.

**Air sensors** are less costly and primarily used for informational purposes. While they can provide valuable data, they typically have higher detection limits, such as measuring in parts per million (PPM) rather than parts per billion (PPB), which may result in less detailed readings. Proper siting is essential to ensure the reliability of their results. However, air sensors are prone to inaccuracies if not calibrated correctly, potentially leading to false positives or negatives. Their accuracy and precision can also diminish over time when exposed to certain pollutants, adverse weather conditions, or without proper maintenance. Thus, while air sensors can offer insights, they generally do not provide the high confidence required for regulatory decision-making.

**Regulatory monitors**, on the other hand, are designed to determine compliance with Environmental Protection Agency (EPA) standards and are subject to stringent requirements. These monitors can be expensive but offer significantly lower detection limits and highly accurate readings. Specific siting requirements are critical to ensure the integrity of the data collected. Regulatory monitors (FRMs) have strict measurement performance criteria and are designed to provide the most sound and scientifically defensible concentration. EPA Office of Research and Development (ORD) approves candidate FRMs methods and any modification to that method. Regulatory monitors provide a higher level of confidence and precision, making them the preferred choice for enforcing air quality standards and ensuring compliance with regulations.

Both types of equipment play a role in community air monitoring efforts, with air sensors offering broad accessibility and initial insights, and regulatory monitors providing the accuracy needed for compliance and enforcement. Together, they form a comprehensive approach to understanding and managing air quality in communities.



**Understanding Accuracy and Precision of Low-cost Air Pollution Monitor Measurements**

**Accurate, not precise**
Accuracy is the closeness of the measurement to what is actually in the air

**Accurate *and* Precise** is the ideal situation

**Precise, not accurate**
Precision is how well the air measurements repeat

8

*Current Examples of Real-time Monitoring Conducted by LDEQ*

Real-time air monitoring involves the continuous tracking of particulate matter (PM) and other environmental parameters at designated sites. Parameters vary by site, but can include: carbon monoxide, ozone, sulfur dioxide, nitrogen oxides, and meteorological data such as wind speed and wind direction. The Louisiana Department of Environmental Quality (LDEQ) conducts real-time air monitoring in compliance with current Environmental Protection Agency (EPA) guidelines through four distinct types of monitoring sites: **continuous, non-continuous, and temporary localized monitoring (TLC)** and sampling **TO-15.**

**Continuous Monitoring:** LDEQ operates 29 continuous monitoring sites statewide, which provide real-time data on particulate matter (PM) and other parameters, including carbon monoxide, ozone, sulfur dioxide, nitrogen oxides, and meteorological data such as wind speed and wind direction. This data is made publicly available on LDEQ's website, offering transparency and immediate access to air quality information. Parameter selection is following siting requirements in 40 CFR Part 58.

**Non-Continuous Monitoring:** LDEQ also manages 7 non-continuous monitoring sites where PM or lead particles are collected on filters and sent to a contracted laboratory for analysis. While these sites do not provide real-time results, the data they produce is critical for tracking long-term trends and ensuring compliance with air quality standards. Parameters include particulate matter and lead. The most important trend to track is attainment or nonattainment of the National Ambient Air Quality Standards (NAAQS.) Other data can be compared to Louisiana Ambient Air Standards to determine if there are any concerns or patterns that can be related to wind direction and a particular source.



**Temporary Localized Monitoring (TLC):** In addition, LDEQ operates 4 TLC sites, which are not required by federal regulations but are strategically placed in areas of interest for approximately one year. These sites utilize a combination of continuous and non-continuous monitoring methods to provide localized data that can address specific community concerns or emerging air quality issues.

Generally the selection of parameters for these sites are based on the issues or based on complaints from community members. For TLC sites, LDEQ locates based on predominate wind direction, location of suspected source (or if no source is known, central to all possible). The site has to be secure, with power located nearby and very few obstructions such as trees or buildings, and located on property where the owner is willing to sign a lease.

One example of this type of monitoring would be LDEQ's efforts to monitor the landfills in Jefferson Parish in late 2020. The concerned facilities were receiving a number of complaints from the community at that time, so LDEQ placed a temporary monitoring site central to all the facilities. LDEQ was able to correlate wind directions with elevated readings to determine the direction of the odors. LDEQ's Surveillance Division was then able to inspect the landfills, finding numerous compliance issues in need of addressing.

**TO-15 Sampling:** Additionally, LDEQ conducts TO-15 sampling for air quality monitoring, operating 19 sites that collect about 3,150 canisters annually. There is no real-time monitoring; currently 17 sites sample based on detections from continuous monitors that trigger sampling at certain concentrations. This results in an additional 200 canisters each year, with each canister analyzed for around 60 compounds, often using two separate methods.

An air sampling canister, commonly referred to as a "summa canister," is a spherical container constructed of specially treated stainless steel used for collecting an air sample. The canister is prepared by evacuating the contents to a vacuum and by opening a stainless steel valve to allow the air sample to enter the canister. Flow controllers can be used to restrict flow and allow for collection at a desired flow rate or over a desired time frame. When the sample has been collected, the valve is closed and the canister is sent to a laboratory for analysis. (EPA Method TO-15 is the procedure used to analyze air samples that are collected through canister sampling, and the analyte list can be tailored to meet specific needs.)

Together, these monitoring efforts enable LDEQ to maintain a comprehensive network that supports regulatory compliance, public awareness, and targeted environmental protection initiatives.

# CURRENT EXAMPLES OF FENCELINE AIR MONITORING CONDUCTED BY LDEQ

## FENCELINE MONITORING

Fenceline monitoring is a process that uses technology to measure the concentrations of air pollutants at the property line of a manufacturing site. It refers to the use of ambient air monitoring equipment to measure ambient air concentrations at a property line or perimeter of a manufacturing site for a specific parameter or parameters. There are various methods in which fenceline monitoring can be implemented.

An example of fenceline monitoring, currently being used, is the environmental requirement of refineries to sample benzene at the fenceline. This type of monitoring uses devices to analyze and provide readings of contaminants in the air. Sampling involves trapping the constituent in a canister or on media and sending that canister or media to an offsite lab for analysis. It is currently being conducted by industry in compliance with EPA guidelines, as outlined by the LDEQ. This includes benzene fenceline monitoring at all 14 refineries and benzene sampling at the perimeter of these facilities.

Additionally, the Hazardous Organic NESHAP (HON) rule applies to 57 manufacturing facilities, which will also undergo perimeter sampling for various hazardous substances, including ethylene oxide (EtO), benzene, 1,3- butadiene, ethylene dichloride, vinyl chloride, and chloroprene. Sampling for these substances is set to begin in April 2026.



# NOTIFICATION  SYSTEMS

## Notification Systems Explained

A system that delivers a message that informs a user of a system event, such as a problem or warning.



## Types of Notification Systems

The notification component for community air monitoring can be delivered through mobile or email alerts to the surrounding populace and includes notifications to the Louisiana Department of Environmental Quality (LDEQ). These notifications would be sent to the community adjacent to the specific monitoring site, ensuring that local residents are informed and aware of any pertinent air quality updates.

## Benefits of Real-time Systems

Real-time air monitoring offers continuous and immediate measurement of air quality parameters, providing instant and up-to-date information on pollutant concentrations. This technology can be effectively utilized to trigger alerts through a notification system, ensuring that our communities are better informed about air quality issues.



# ASSOCIATED COSTS FOR NOTIFICATION  SYSTEMS

*Cost Analysis*

The costs to install, operate, and maintain a community air monitoring system were estimated based on parameters outlined in past legislative proposals, including Senate Bills 35, 20, 2, and 367 from 2023, 2022, 2021, and 2020, respectively. These bills proposed real-time monitoring at all Title V facilities in Louisiana for EPA-defined criteria pollutants and toxic air pollutants regulated by LDEQ.

As of September 16, 2024, there were **476 Title V facilities in Louisiana**, ranging from large industrial complexes to sugar cane processing plants, commercial bakeries, and Louisiana State University. A comprehensive list of these facilities and the 235 compounds identified in their permits can be found in *Attachments B and C,* respectively.

In estimating costs for purposes of this report, it was assumed that each Title V facility would require only one ambient air monitoring site.  However, for real world applications, larger facilities may require additional sites.  If previously proposed bills requiring fence-line monitoring had become law, the language of those bills would likely require larger facilities to have more than one site or monitoring system. This is the case, even though cost estimates for those proposed bills were based on one site per facility.

Equipment costs were calculated using LDEQ unit costs, while annual operation and maintenance costs were based on data from existing community air monitoring systems. For the purposes of this resolution, LDEQ costs are assumed to be similar to industry costs for the same or similar equipment. Therefore, this report proceeds under the consideration that there would not be significant differences, in the big picture.



The proposed monitoring parameters include four of the six criteria pollutants—sulfur dioxide ($SO_2$), particulate matter (PM), carbon monoxide (CO), and nitrogen dioxide ($NO_2$)—as well as ammonia, hydrogen sulfide ($H_2S$), methane/non-methane hydrocarbons, wind speed, and wind direction.

- **_Sulfur dioxide:_** a colorless, poisonous gas produced during the combustion of coal or oil containing sulfur.
- **_Particulate matter:_** the term for a mixture of solid particles and liquid droplets found in the air.
- **_Carbon monoxide:_** colorless, practically odorless, and tasteless gas that results from incomplete oxidation of carbon in combustion.
- **_Nitrogen dioxide:_** one of a group of highly reactive gases known as oxides of nitrogen or nitrogen oxides and gets in the air from the burning of fuel.

These particles come in many shapes and sizes and can be made up of hundreds of different chemicals. Particulate matter is categorized by the size of the particles where inhalable particles with diameters 10 micrometers or less are defined as PM10 and particles with a diameter of 2.5 micrometers or smaller are defined as PM2.5.

Additionally, it is proposed to monitor TO-15 analytes in real time using a Selected Ion Flow Tube (SIFT) Instrument, supplemented by canister collection and TO-15 analysis on a six-day sampling schedule or through strike samples. From the SIFT website, Ion Flow-Tube Mass Spectrometry (SIFT-MS) is a form of direct mass spectrometry. It applies precisely controlled chemical ionization reactions to detect and quantify trace amounts of volatile organic compounds (VOCs) and inorganic gases. SIFT- MS is a unique trace gas analyzer capable of real-time VOC analysis and inorganic compound detection.

The other two criteria pollutants, ozone and lead, were not included in the proposed list of parameters because ozone is formed in the atmosphere and not emitted by any facility. Similarly, lead is handled in a very small number of facilities and real time monitoring of lead would not provide any useful results.

This comprehensive monitoring approach highlights the significant resources required to ensure accurate and reliable air quality data, demonstrating the complexities and costs of implementing large-scale community air monitoring systems.

# ADDITIONAL  COSTS

## Regulatory Grade Monitors

The cost of implementing regulatory-grade air monitors for the Louisiana Department of Environmental Quality (LDEQ) includes both upfront equipment expenses and annual operation and maintenance costs. According to estimates from Senate Bill 35 (2023), the total equipment cost per monitoring site is approximately just over $791,000. All equipment costs were calculated using LDEQ unit costs (the cost for LDEQ to purchase), while operational costs were estimated from community air monitoring systems currently in operation.

In addition, the annual operating and maintenance costs for each site range between $150,000 and $200,000. These expenses reflect the high standards required for regulatory-grade monitors, which are essential for providing accurate, reliable data to ensure compliance with federal and state air quality regulations.

## Notification System

Real-time notification systems are an essential component of a community air monitoring system, designed to promptly alert the public when air monitors detect an exceedance of air quality standards. These systems operate by disseminating notifications, such as text messages or telephone calls, to inform surrounding communities of detected exceedances.

The cost of implementing such a statewide notification system depends on its type and functionality. Cost estimates, acquired in collaboration with industry affiliates, suggest that the initial setup, licensing, and annual maintenance of a comprehensive notification system could total approximately $5.2 million. This investment reflects the advanced technology and infrastructure required to ensure timely and accurate communication of air quality conditions, supporting LDEQ's mission to protect public health and the environment.

# LDEQ Cost Estimates

Implementing real-time air monitoring notification systems would require significant resources for the Louisiana Department of Environmental Quality to ensure data quality, proper reporting, and compliance. LDEQ would be responsible for reviewing initial siting plans for each facility's monitoring system, conducting Quality Assurance (QA) and Quality Control (QC) to validate the captured data, making necessary modifications to monitoring plans, and overseeing ongoing data reporting.

Based on fiscal notes from Senate Bill 35 (2023), LDEQ estimates that an additional 48 staff positions would be needed to support these functions, at an annual cost of approximately $8.2 million. LDEQ's staff are responsible for ensuring that the data is captured correctly and that the appropriate Quality Assurance (QA) procedures are followed. These personnel would join the current team of seven (7) dedicated staff managing data for the existing network of 38 monitoring sites, significantly expanding LDEQ's capacity to handle the increased workload.

This comprehensive effort underscores the substantial financial and operational commitment required to implement a robust, statewide real-time air monitoring notification system that meets the agency's high standards for accuracy and transparency.



# AIR POLLUTANTS

Air pollutants are defined by the Environmental Protection Agency (EPA) as any physical, chemical, biological, or radioactive substance that enters the air, including precursors to the formation of other pollutants. These pollutants originate from various sources, such as vehicle exhaust, industrial emissions (e.g., power plants, refineries, chemical manufacturing), natural events like forest fires, and indoor sources such as cleaning products and building materials. Once released, air pollutants are transported through the atmosphere and can be deposited into water, soil, and sediment. From these media, pollutants can enter the food chain via fruits, vegetables, fish, and animal products, or people can be exposed through inhalation, ingestion, or direct contact with contaminated air, water, soil, or dust.

Sections 108 and 109 of the Clean Air Act (CAA) govern the establishment, review, and revision, as appropriate, of the National Ambient Air Quality Standards (NAAQS) for each criteria air pollutant to provide protection for the nation's public health and the environment.

The EPA classifies air pollutants into two main categories: **common air pollutants** and **hazardous air pollutants (HAPs)**.

**Common air pollutants**, also known as criteria pollutants, include six key substances: carbon monoxide, nitrogen dioxide, sulfur dioxide, ground-level ozone, lead, and particulate matter. These pollutants are regulated under the National Ambient Air Quality Standards (NAAQS) due to their widespread presence and potential to harm human health and the environment.

**Hazardous air pollutants (HAPs)**, or toxic air pollutants, are substances known or suspected to cause cancer or other serious health effects. Examples include dioxins, lead, mercury, tetrachloroethylene, and benzene. Within this category, the EPA has identified 30 urban air toxic pollutants, such as benzene, arsenic compounds, formaldehyde, quinolone, and polychlorinated biphenyls, which pose significant risks in urban areas. HAPs are established in Section 112 of the CAA, and the EPA's HAPs list includes 188 pollutants.

Additionally, Louisiana regulates **Toxic Air Pollutants (TAPs)**, which include both federally regulated HAPs and additional pollutants such as ammonia, barium, hydrogen sulfide, methyl ethyl ketone, sulfuric acid, and others. Louisiana's TAPs program is more stringent than federal regulations, as it establishes ambient air standards for each listed pollutant. The full list of TAPs is available in the Louisiana Administrative Code (LAC 33:III, Chapter 51, Tables 51.1–51.3).

Together, these classifications highlight the diverse nature of air pollutants and the need for comprehensive monitoring and regulation to protect public health and the environment.

# Public Health Impacts Associated with Air Pollutants

The potential for health impacts associated with exposure to Title V air pollutants can be evaluated using air monitoring data. Potential health risks associated with exposure to air pollutants are evaluated using the methods present in the EPA's Risk Assessment Guidance for Superfund Volume I Human Health Evaluation Manual, Part A (EPA 1989).

In accordance with this manual, health effects associated with chemical exposure are divided into two categories: cancer (carcinogenic) health effects and noncancer (noncarcinogenic) health effects. The health risks associated with exposure to these pollutants are evaluated through the Environmental Protection Agency's (EPA) Risk Assessment Guidance for Superfund, which provides methodologies to estimate and assess risks to human health.

***Carcinogenic Health Effects***: Occurs when abnormal cells in the body grow uncontrollably, forming tumors that may remain localized or invade other tissues. Chemicals that are known or suspected to cause cancer are referred to as carcinogens. Examples of carcinogens and their associated cancers include benzene (leukemia), trichloroethylene (kidney and liver cancers, non-Hodgkin lymphoma), and vinyl chloride (liver cancer).

Risk assessments for carcinogens estimate the probability of an individual developing cancer over a lifetime due to exposure, known as "excess individual lifetime cancer risk." Acceptable cancer risk is defined as a lifetime risk within the range of 1 in 1,000,000 ($10^{-6}$) to 1 in 10,000 ($10^{-4}$). These estimates are based on site-specific exposure concentrations and compared to the acceptable risk range to determine whether further action or detailed assessment is required.

For example, an annual average detected concentration of 6.9 ug/m3 of vinyl chloride in the ambient air has an an estimated cancer risk of 3 in 100,000 (3 x 10-5) which is within the acceptable risk range of 1 in 1,000,000 to 1 in 10,000. Therefore, unacceptable cancer risk is not expected to be associated with this exposure level.

***Noncarcinogenic Health Effects***: Refers to adverse outcomes other than cancer, caused by exposure to specific chemicals. These effects can range from minor symptoms, such as eye and nose irritation, to more severe conditions, including asthma, chronic obstructive pulmonary disease (COPD), reproductive issues, or birth defects. Examples of noncarcinogenic pollutants include:
- Asthma: 2,4-toluene diisocyanate, metals, irritants.
- Chronic obstruction pulmonary disease: Polycyclic aromatic hydrocarbons, metals.
- Reproductive effects: Polychlorinated biphenyls (PCBs), dioxins, organophosphates.
- Birth defects: Lead, mercury, PCBs, toluene.

Risk assessments for noncancer effects use a hazard quotient (HQ), calculated as the ratio of the exposure level to the reference concentration (RfC). For example, if the annual average detected concentration of toluene in the ambient air is 2500 ug/m3 (i.e., the exposure level) and the reference concentration for toluene in ambient air is 5000 ug/m3, the hazard quotient would be 2500 ug/m3 divided by 5000 ug/m3 which equals
0.5. A hazard quotient of 0.5 is less than 1.0 therefore, noncancer health effects would not be expected to occur.

Reference concentrations, which estimate exposure levels unlikely to cause adverse effects, are developed through extensive toxicological assessments and are available in the EPA's Integrated Risk Information System (IRIS). These values are periodically updated by the EPA based on new scientific data.

By evaluating both carcinogenic and noncarcinogenic risks, public health efforts aim to reduce exposure to harmful air pollutants, ensuring the safety and well-being of communities.



# AIR POLLUTANT EFFECTS

## Potential to Cause Health Effects

The potential for air pollutants to cause health effects depends on a variety of factors (EPA; National Institute of Health; Centers for Disease Control; World Health Organization; and American Lung Association). These factors include the type of chemical, the concentration of pollutant in the air, the frequency and duration of exposure, and individual characteristics such as age, sex, genetics, overall health, and lifestyle factors like tobacco use and diet. For example, in general, the elderly, pregnant women, children, and people with certain pre-exiting health conditions such as asthma or other respiratory diseases are more susceptible to experiencing health effects due to air pollution.

Site-specific exposure conditions and the characteristics of the individual exposed together determine whether or not exposure to a specific air pollutant will result in an adverse health effect.

## Costs Associated with Public Health Impacts

LDEQ collaborated with the Louisiana Department of Health to evaluate the potential costs associated with public health impacts from air pollutants in the state. This consultation revealed that additional research is necessary to accurately quantify the health costs linked to Title V air pollutants emitted in Louisiana. Given the complexity of this issue and the scope of the data required, it was determined that additional funding and time are necessary to develop comprehensive and reliable estimates of these costs. This underscores the need for further investment in research to fully understand and address the economic and public health implications of air pollution.

# RECOMMENDATIONS

The Community Air Monitoring and Notification System Task Force has outlined recommendations for implementing community air monitoring and notification systems that aim to optimize resources, maximize impact, and foster public trust. These recommendations consider necessary changes to current laws and potential strategies for prioritization, sensor incorporation, and siting.

1.  Prioritization of Monitoring Sites: One recommendation would be for the State to prioritize the top 10 - 20% of Title V facilities based on total emissions, toxicity of emissions, and proximity to populations. This phased approach, starting with the highest-priority sources, would limit initial expenditures, allow refinement of monitoring tools, and enable strategic deployment of multiple monitors at the largest emitting facilities or clusters. The EPA's AirToxScreen Tool, which uses census-block-level data, could guide this ranking process and ensure resources are allocated effectively. Subsequent phases could then expand coverage to all Title V facilities.

2.  Sensor Incorporation: To complement comprehensive real-time monitoring, another suggestion would be to use simple sensors as sentinel systems in surrounding communities. While these sensors may not provide the detailed data of regulatory-grade monitors, they are capable of detecting plumes and other pollutants moving through community airsheds. This addition would enhance monitoring coverage and fill gaps in data that stationary monitors may miss. As mentioned elsewhere, EPA's AirToxScreen data, which accounts for meteorological conditions and dispersion characteristics, could be used to strategically place these sensors and improve their effectiveness.

3.  Siting Strategy: Another recommendation from the Task Force would be to engage the public in determining monitor placement and pollutants to be monitored. This participatory process would ensure optimal siting of monitoring systems while fostering community awareness and trust. Public input would enhance transparency and accountability while building local support for the program.