# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

RISE ST. JAMES LOUISIANA, et al.,

    Plaintiffs,

    v.

COURTNEY J. BURDETTE, in her official capacity as Secretary of the Louisiana Department of Environmental Quality, et al.,

    Defendants.

Civil Action No. 3:25-cv-00429-JWD-RLB

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

David Bookbinder
(DC Bar No. 455525)
Environmental Integrity Project
888 17th Street NW
Washington, DC 20006
(301) 751-0611
dbookbinder@environmentalintegrity.org
*Admitted pro hac vice*

Mariah Harrod
(TX Bar No. 24143847)
Environmental Integrity Project
888 17th Street NW
Washington, DC 20006
(856) 503-8645
mharrod@environmentalintegrity.org
*Admitted pro hac vice*

Caitlion O'Neill
(LA Bar No. 40566)
RISE St. James Louisiana
2150 Allston Way
Suite 460
Berkeley, CA 94704
(504) 321-1360
chunter@risestjames.org

Nandan M. Joshi
(DC Bar No. 456750)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-7733
njoshi@citizen.org
*Admitted pro hac vice*

September 5, 2025

# TABLE OF CONTENTS

Table of Authorities.................................................................................................. ii

Introduction .......................................................................................................... 1

Background ........................................................................................................... 2

Legal Standards..................................................................................................... 6

Argument .............................................................................................................. 7

I.     CAMRA imposes substantive restrictions on community groups. ............... 7

II.    This Court has jurisdiction to adjudicate Plaintiffs' claims. ..................... 10

     A.    Plaintiffs have Article III standing. ...................................... 10

     B.    Defendants do not have sovereign immunity. ............................ 12

III.   CAMRA violates Plaintiffs' First Amendment rights. ......................... 17

IV.   CAMRA's restrictions are preempted by federal law............................ 23

Conclusion .......................................................................................................... 25

Attachment:

Text of Community Air Monitoring Reliability Act

# TABLE OF AUTHORITIES

**CASES**                                                                                    **Page(s)**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..................................................................................................7

*Barilla v. City of Houston, Texas,*
   13 F.4th 427 (5th Cir. 2021)...............................................................................10, 12

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)..................................................................................................7

*Book People, Inc. v. Wong,*
   91 F.4th 318 (5th Cir. 2024)...................................................................................16

*California Motor Transport Co. v. Trucking Unlimited,*
   404 U.S. 508 (1972)................................................................................................22

*City of Austin v. Paxton,*
   943 F.3d 993 (5th Cir. 2019)..................................................................................13

*City of Morgan City v. South Louisiana Electric Cooperative Ass'n,*
   31 F.3d 319 (5th Cir. 1994)....................................................................................24

*Diamond Alternative Energy, LLC v. EPA,*
   145 S. Ct. 2121 (2025)...........................................................................................10

*Ex parte Young,*
   209 U.S. 123 (1908)...............................................................................................12

*FDA v. Alliance for Hippocratic Medicine,*
   602 U.S. 367 (2024)...............................................................................................10

*First National Bank of Boston v. Bellotti,*
   435 U.S. 765 (1978)...............................................................................................19

*Free Speech Coalition, Inc. v. Paxton,*
   145 S. Ct. 2291 (2025)...........................................................................................21

*Freedom From Religion Foundation, Inc. v. Mack,*
   4 F.4th 306 (5th Cir. 2021),
   *vacated,* 49 F.4th 941 (5th Cir. 2022) ..................................................................13

*Geier v. American Honda Motor Co., Inc.,*
   529 U.S. 861 (2000)...............................................................................................25

*Green Valley Special Utility District v. City of Schertz,*
   969 F.3d 460 (5th Cir. 2020) (en banc)..................................................................13

*Haywood v. Drown,*
    556 U.S. 729 (2009).................................................................................................24

*Healthy Vision Ass'n v. Abbott,*
    138 F.4th 385 (5th Cir. 2025)........................................................12, 13, 14, 15, 16, 17

*Hines v. Pardue,*
    117 F.4th 769 (5th Cir. 2024).............................................................................17, 18

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010).....................................................................................................21

*Ingersoll-Rand Company v. McClendon,*
    498 U.S. 133 (1990).................................................................................................23

*Institute for Free Speech v. Johnson,*
    -- F.4th --, 2025 WL 2104354 (5th Cir. July 28, 2025)..........................13, 14, 16

*Justice v. Hosemann,*
    771 F.3d 285 (5th Cir. 2014)....................................................................................10

*K.P. v. LeBlanc,*
    627 F.3d 115 (5th Cir. 2010).....................................................................................14

*Lane v. Halliburton,*
    529 F.3d 548 (5th Cir. 2008)....................................................................................6, 7

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).................................................................................................10

*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)...................................................................................................6

*Maxim Crane Works, L.P. v. Zurich American Insurance Co.,*
    11 F.4th 345 (5th Cir. 2021).......................................................................................6

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)..................................................................................................18

*Moore v. Louisiana Board of Elementary & Secondary Education,*
    743 F.3d 959 (5th Cir. 2014)...............................................................................12, 13

*Morris v. Livingston,*
    739 F.3d 740 (5th Cir. 2014).....................................................................................15

*National Press Photographers Ass'n v. McCraw,*
    90 F.4th 775 (5th Cir. 2024).......................................................................10, 11, 15, 21

*Okpalobi v. Foster,*
  244 F.3d 405 (5th Cir. 2001) (en banc) ...................................................................16

*Oneok, Inc. v. Learjet, Inc.,*
  575 U.S. 373 (2015) ...................................................................................................23

*Police Department of Chicago v. Mosley,*
  408 U.S. 92 (1972) .....................................................................................................17

*Porretto v. City of Galveston Park Board of Trustees,*
  113 F.4th 469 (5th Cir. 2024) ......................................................................................6

*Quality Infusion Care, Inc. v. Health Care Service Corp.,*
  628 F.3d 725 (5th Cir. 2010) .......................................................................................6

*Ramming v. United States,*
  281 F.3d 158 (5th Cir. 2001) ...................................................................................6, 7

*Reed v. Goertz,*
  598 U.S. 230 (2023) ...................................................................................................13

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) .......................................................................................17, 18, 19

*Riley v. National Federation of the Blind of North Carolina, Inc.,*
  487 U.S. 781 (1988) ...................................................................................................20

*Roake v. Brumley,*
  141 F.4th 614 (5th Cir. 2025) ....................................................................................13

*Rosenberger v. Rector and Visitors of University of Virginia,*
  515 U.S. 819 (1995) .......................................................................................17, 18, 20

*Smith v. Highway Employees,*
  441 U.S. 463 (1979) ...................................................................................................21

*Spectrum WT v. Wendler,*
  -- F.4th --, 2025 WL 2388306 (5th Cir. Aug. 18, 2025) ...........................................14

*Speech First, Inc. v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) ................................................................................11, 12

*Susan B. Anthony List v. Driehaus,*
  573 U. S. 149 (2014) ..................................................................................................10

*Summit Medical Associates, P.C. v. Pryor,*
  180 F.3d 1326 (11th Cir. 1999) .................................................................................13

*Texas Alliance for Retired Americans v. Scott*,
   28 F.4th 669 (5th Cir. 2022) ...............................................................15

*Texas Medical Ass'n v. U.S. Department of Health & Human Services*,
   110 F.4th 762 (5th Cir. 2024) .............................................................11

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .............................................................................10

*Turtle Island Foods, S.P.C. v. Strain*,
   65 F.4th 211 (5th Cir. 2023) ...............................................................12

*United States ex rel. Johnson v. Raytheon Co.*,
   93 F.4th 776 (5th Cir.),
   *cert. denied sub nom. United States v. Raytheon Co.*,
   145 S. Ct. 356 (2024) .............................................................................6

*White Hat v. Murrill*,
   141 F.4th 590 (5th Cir. 2025) .............................................................15

*Whole Woman's Health v. Jackson*,
   595 U.S. 30 (2021) ...............................................................................16

*Young Conservatives of Texas Foundation v. Smatresk*,
   73 F.4th 304 (5th Cir. 2023) ...............................................................23

## CONSTITUTION AND STATUTES

42 U.S.C. § 7401 *et seq.* .............................................................................2

42 U.S.C. § 7413(a), (b), (d), (f) .............................................................3, 23

42 U.S.C. § 7416 ................................................................................24, 25

42 U.S.C. § 7438 ........................................................................................2

42 U.S.C. § 7604 ................................................................................20, 23

42 U.S.C. § 7604(a)(1) .....................................................................3, 23, 23

42 U.S.C. § 7604(b)(1) ..........................................................................3, 23

American Rescue Plan of 2021,
   Pub. L. No. 117-2, § 6002(a)(2), 135 Stat. 4 ...................................2, 24

Inflation Reduction Act of 2022,
   Pub. L. No. 117-169, § 60105, 136 Stat. 1818, 2067 .......................2, 24

La. R.S. §§ 30:2001–2588 ....................................................................................4

La. R.S. § 30:2025 ...............................................................................12, 14, 15

La. R.S. § 30:2025.A .................................................................................4, 14, 15

La. R.S. § 30:2025.C(3) ................................................................................4, 14

La. R.S. § 30:2025.E(1)(a) ..................................................................................5

La. R.S. §§ 30:2381.1–.11 ...................................................................................1

La. R.S. § 30:2381.2 ..........................................................................3, 9, 18, 21

La. R.S. § 30:2381.3 ..........................................................................................18

La. R.S. § 30:2381.4(2) ................................................................................18, 20

La. R.S. § 30:2381.4(9) .....................................................................................20

La. R.S. § 30:2381.4(10) ...................................................................................20

La. R.S. § 30:2381.4(11) ..............................................................................18, 20

La. R.S. § 30:2381.5 ......................................................................................3, 8

La. R.S. § 30:2381.6 .........................................................................3, 9, 19, 20, 24

La. R.S. § 30:2381.9 .........................................................................4, 9, 19, 20, 24

La. R.S. § 30:2381.10 ........................................................................4, 8, 20, 22

La. R.S. § 30:2381.10.A .................................................................................4, 8

La. R.S. § 30:2381.10.B .................................................................................4, 8

La. R.S. § 30:2381.10.B(2) ..........................................................................4, 24

La. R.S. § 30:2381.10.C .................................................................................4, 8

## OTHER AUTHORITIES

40 C.F.R. Parts 50, 53, 58 ....................................................................................2

Federal Rule of Civil Procedure 12(b)(1) ............................................................1

Federal Rule of Civil Procedure 12(b)(6) ............................................................1

Louisiana Administrative Code, Title 33, Part III ...............................................2

## INTRODUCTION

Plaintiffs are six community groups that seek to use low-cost air sensors to monitor air quality in their communities and use the information they obtain to advise their neighbors and regulators about the pollutants they detect. Prior to enactment of the Community Air Monitoring Reliability Act (CAMRA), La. R.S. §§ 30:2381.1-.11, Plaintiffs could engage in these activities without fear of being subject to state enforcement action and incurring crippling civil liabilities for the data and analyses they collected and disseminated. CAMRA, however, makes it unlawful for community groups to operate air monitoring programs that do not comply with the statute's onerous and costly restrictions on the collection, use, and dissemination of air quality data. Plaintiffs accordingly filed this action against two officers of the Louisiana Department of Environmental Quality (LDEQ) and the state attorney general—the three state officials who have the statutory duty to enforce CAMRA's requirements. Plaintiffs seek declaratory and injunctive relief to prevent enforcement of those requirements because they violate Plaintiffs' speech and petitioning rights under the First and Fourteenth Amendments and are preempted by federal law.

Plaintiffs move for summary judgment on their claims because CAMRA's restrictions on Plaintiffs' ability to collect and communicate air quality information are invalid as a matter of law. Indeed, in seeking dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants do not seriously attempt to defend CAMRA as written. Instead, they portray CAMRA as a rule of evidence that imposes no substantive restrictions on Plaintiffs. LDEQ has recognized, however, that CAMRA imposes substantive requirements on community air monitoring programs, and the statute's plain language confirms that LDEQ's reading—not Defendants' litigation stance—is the correct one. And as a substantive regulation, CAMRA's restrictions are indefensible. For these reasons and those set forth below, this Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion to dismiss.

1

# BACKGROUND

**Federal air quality initiatives.** The Clean Air Act and associated state clean air laws seek to improve air quality and public health by regulating air pollution emitted from industrial operations. *See* 42 U.S.C. § 7401 *et seq.*; La. Admin. Code tit. 33, part III. The Environmental Protection Agency (EPA) relies on air monitoring systems to detect levels of air pollution in the ambient air and has established technical standards that such monitoring systems must satisfy for regulatory purposes. *See* 40 C.F.R. Parts 50, 53, 58. These monitors are expensive to deploy and operate, which limit their ability to assess air quality in many local communities located far from the sites of regulatory monitors. *See* Joshi Decl., Ex. 1 – 2025 LDEQ Report 16 (noting that, for each site, regulatory-grade monitors cost $791,000 and $150,000 to $200,000 annually in operating and maintenance costs).

To help address coverage gaps and provide communities with more information about their air quality, Congress and EPA have encouraged deployment and use of low-cost air sensors through agency initiatives and grants and loans. *See*, *e.g.*, *id.*, Ex. 2 – Air Sensor Guidebook 2–6, 26 (describing air sensor technology and uses); *id.*, Ex. 3 – EPA Q&A (providing guidance to groups interested in air sensor technology); EPA, Air Sensor Toolbox, https://www.epa.gov/air-sensor-toolbox. For instance, in 2014, EPA funded "research on empowering communities and individuals to take action to avoid air pollution exposure, using low-cost portable air pollution sensors." *Id.*, Ex. 4 – EPA Request for Applications 2. EPA also lends air sensors to groups in Louisiana and other states, *id.*, Ex. 5 – EPA Air Sensor Loan Program 15–16, and has issued grants support community air monitoring through funding made available from the American Rescue Plan of 2021, Pub. L. No. 117-2, § 6002(a)(2), 135 Stat. 4, 93, and the Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 60105, 136 Stat. 1818, 2067; 42 U.S.C. § 7438. *See* Joshi Decl., Exs. 6 and 7 (EPA grant announcements).

2

The Clean Air Act authorizes EPA to bring an administrative or judicial action to enforce the emissions standards under the Clean Air Act based on any information "available." 42 U.S.C. § 7413(a), (b), (d). It also authorizes EPA to pay an award to "any person who furnishes information" leading to a criminal conviction or a judicial or administrative civil penalty. *Id.* § 7413(f). In addition, under the Clean Air Act's citizen-suit provision, "any person" may bring a civil action for violations of an "emission standard or limitation" or an EPA or state order "with respect to such a standard or limitation." *Id.* § 7604(a)(1). Before filing a citizen suit, a plaintiff must provide 60 days' notice to the EPA and the state. *Id.* § 7604(b)(1).

**CAMRA.** The Louisiana legislature enacted CAMRA "to establish standards for community air monitoring programs operated by entities to ensure that the data collected from such programs provides the public with access to accurate air quality information." La. R.S. § 2381.2. Section 2381.5 of CAMRA, entitled "Community air monitoring requirements," requires community groups to collect air quality data using EPA-designated methods applicable to regulatory air monitors, but only when monitoring air quality for the purpose of "alleging violations of or noncompliance with" federal or state clean air laws. *Id.* § 30:2381.5. If a community group remains silent about potential violations of or noncompliance with clean air laws, it is not subject to section 2381.5's restrictions.

Section 2381.6, entitled "Data collection integrity," restricts the methods that community groups may use collect and analyze air quality data. *Id.* § 30:2381.6. Section 2381.6 broadly prohibits community groups from conducting—and thus disseminating—air quality analyses that do not satisfy CAMRA's standards. Section 2381.6 also requires community groups to include a so-called "quality assurance certification of methods or equipment" when disseminating analysis not performed by a state-accredited laboratory. *Id.*

Section 2381.9, entitled "Data communication," directly regulates "[a]ny release or communication of the collected monitoring data" by community air monitoring programs. *Id.* § 30:2381.9. It requires any such release or communication to "include clear explanations of data interpretation, appropriate context, including the applicable or comparable ambient air standard data limitations, and relevant uncertainties." *Id.*

Section 2381.10, entitled "Prohibition on use of monitoring data," is the only CAMRA provision that refers to the involvement of community air monitoring programs in enforcement proceedings. *Id.* § 30:2381.10. Subsection A provides that community air monitoring data is per se "insufficient" to prove a violation against a stationary source. *Id.* § 30:2381.10.A. Subsections B and C, read together, prohibit both LDEQ and community groups from using, disclosing or disseminating community air monitoring data "for purposes of or in support of … [i]ssuing a fine, penalty, or violation," or "[b]ringing an administrative, regulatory, or judicial enforcement action or proceeding" against air polluters. *Id.* § 30:2381.10.B.–C. These impairments do not apply to data obtained from a source other than community air monitoring programs.

CAMRA is codified in Subtitle II of Title 30 of Louisiana Revised Statutes, La. R.S. §§ 30:2001–2588. Defendants share responsibility for enforcing the requirements of Subtitle II. For instance, "[a]ny civil action necessary to carry out the provisions of this Subtitle shall be brought by the secretary," and "[i]n such suits, the secretary shall be represented by the attorney general." *Id.* § 30:2025.A. Similarly, in response to a past or future violation, "the assistant secretary for the office of environmental compliance shall issue an order requiring compliance within a specified time period, or the secretary shall commence a civil action for appropriate relief, including a temporary or permanent injunction." *Id.* § 30:2025.C(3). Community groups that

violate CAMRA face civil penalties of up to $32,500 per day and an additional $1 million penalty if the violation is intentional, willful, or knowing. *Id.* § 30:2025.E(1)(a).

**Plaintiffs' Air Monitoring Programs**. Plaintiffs operate community air monitoring programs for communities in Louisiana. RISE St. James Louisiana has used air sensors to measure air pollution levels in St. James Parish and would like to "conduct further air monitoring to further [its] goal of protecting St. James community members from harmful pollution." Lavigne Decl. ¶ 8. Micah 6:8 Mission has used air sensors, some of which were funded by a grant from the EPA, to monitor air quality affected by industrial facilities in Sulphur, Westlake, Dequincy, Lake Charles, and Hayes, Louisiana. Robertson Decl. ¶¶ 5, 8. It seeks to use and disseminate air sensor data to inform its community about air quality. *Id.* ¶ 11. The Descendants Project uses air sensors in Laplace and Wallace, Louisiana, and would like to use and disseminate air quality information for legal and advocacy purposes and to raise public awareness. Banner Decl. ¶¶ 8–12. The Concerned Citizens of St. John, Inc. (CCSJ) conducts and shares air quality data in St. John Parish "to advocate for the health and safety of all citizens by holding government officials and industry accountable for the quality of our Parish's air, water, and soil." Taylor Decl. ¶ 4. Claiborne Avenue Alliance Design Studio, Inc. uses air sensors pursuant to an EPA grant to monitor air quality near the I-10 expressway along Claiborne Avenue in New Orleans and would like to disseminate the data it collects to the public and EPA. Stelly Decl. ¶¶ 3, 6. JOIN for Clean Air monitors air quality in the greater New Orleans area and would like to disseminate the data it collects and use it for legal and advocacy purposes. Vittitow Decl. ¶¶ 6–7, 9. CAMRA and the threat of liability it poses have deterred Plaintiffs from collecting, using, and disclosing air quality data. Lavigne Decl. ¶¶ 6–11; Robertson Decl. ¶¶ 11–12; Banner Decl. ¶¶ 11–13; Taylor Decl. ¶¶ 10–12; Stelly Decl. ¶¶ 8–9; Vittitow Decl. ¶¶ 7–8, 10–11.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56(a), a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute does not exist where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 728 (5th Cir. 2010). "Where … the only issues before the court are pure questions of law, summary judgment is appropriate." *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) (cleaned up).

"Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute." *Id.* "Subject-matter jurisdiction may be assessed on: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *United States ex rel. Johnson v. Raytheon Co.*, 93 F.4th 776, 783 (5th Cir.) (internal quotation marks omitted), *cert. denied sub nom*. *United States v. Raytheon Co.*, 145 S. Ct. 356 (2024). The court should "'take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff.'" *Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 481 (5th Cir. 2024) (quoting *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008)). "[A] motion to dismiss for lack of subject matter jurisdiction should be granted only

if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming*, 281 F.3d at 161.[1]

"Under Rule 12(b)(6), a claim should not be dismissed unless the court determines that it is beyond doubt that the plaintiff cannot prove a plausible set of facts that support the claim and would justify relief." *Lane*, 529 F.3d at 557. This Court must ask whether Plaintiffs' complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is satisfied where the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## ARGUMENT

## I.    CAMRA imposes substantive restrictions on community groups.

As Plaintiffs have explained, CAMRA directly regulates their collection, use, and dissemination of air quality data and analysis. *See supra* pp. 3–5. Contesting that plain reading of the statute, Defendants argue that CAMRA applies only to community programs that "monitor air quality for purposes of alleging violations or noncompliance" with clean air laws, but does not otherwise regulate the collection, use, and dissemination of air quality data. Defs.' Mem. 1, and that CAMRA "regulates only how [LDEQ] uses certain community-collected air data in its own enforcement proceedings," *id.* at 15; *see also id.* at 2 ("CAMRA regulates the evidentiary use of community air monitoring data in state enforcement"). These arguments are inconsistent with the statutory text and LDEQ's interpretation of it.

---

[1] Although Defendants' memorandum correctly states that a dismissal under Rule 12(b)(1) would be without prejudice, Defs.' Mem. 5 (ECF 18-1), their proposed order incorrectly proposes that dismissal for lack of subject matter jurisdiction be with prejudice. *See* ECF 18-2.

Only one of the four CAMRA provisions at issue—section 2381.10—addresses the use of air quality data in enforcement proceedings. Subsection A provides that community air monitoring data (but not similar data from other sources) is per se "insufficient" to prove a violation against a stationary source, regardless of whether the community air monitoring data is collected and analyzed in accordance with CAMRA. La. R.S. § 30:2381.10.A. Subsection B bars LDEQ from disclosing or disseminating community air monitoring data that does not comply with CAMRA "for purposes of *or in support of*" an enforcement action against a polluter, *id*. § 2381.10.B (emphasis added). Although subsection B applies only to LDEQ, subsection C extends subsection B's "prohibitions" to "any person [using] any monitoring data not in compliance with [CAMRA] for purposes of alleging violations or noncompliance" with federal and state clean air laws, *id*. § 2381.10.C. And nothing in section 2381.10 limits the application of its prohibitions to *state-initiated* enforcement proceedings. Thus, under section 2381.10's plain text, a community group that discloses or disseminates air quality information to LDEQ or EPA "in support of" an enforcement action, or "for purposes of or in support of" a citizen suit, violates CAMRA if the information is not collected and analyzed according to CAMRA's requirements.

Section 2381.5 addresses air monitoring "for the purpose of alleging violations or noncompliance" with clean air laws, but that provision is not confined to allegations made in the context of state-enforcement proceedings, or any judicial or administrative proceedings. By its terms, a community group violates CAMRA if it states (*e.g.*, on its website or in a letter to regulators) that a stationary source is exceeding emissions limits as measured by air sensor data or that the concentration of specific pollutants violates air quality standards. A group that reported only compliant emission levels, by contrast, would not face liability under CAMRA. Contrary to Defendants' suggestion, Defs.' Mem. 1–2, 4, Plaintiffs do not want to stay quiet if their monitoring

reveals that emissions standards have been exceeded. *See*, *e.g.*, Lavigne Decl. ¶ 11; Banner Decl. ¶ 9; Taylor Decl. ¶ 12. It is the threat of civil liability that forces them into silence. *See supra* p. 5.

The final two provisions—sections 2381.6 and 2381.9—contain no language limiting their reach to air monitoring conducted for purposes of alleging violations or noncompliance with clean air laws or to state-initiated enforcement proceedings. Defendants never explain why those two provisions are limited in the ways that they contend.

If there were any lingering doubt about CAMRA's reach, section 2381.2 eliminates it. That provision makes clear that the legislature enacted CAMRA to "establish standards … to ensure that the data collected" from community air monitoring programs "*provides the public* with access to accurate air quality information." La. R.S. § 2381.2 (emphasis added). Notably absent is any indication that CAMRA's restrictions should only apply in the context of state-initiated enforcement proceedings or to monitoring performed for specific purposes.

Defendants' interpretation of CAMRA's, moreover, is inconsistent with LDEQ's. In its February 2025 report, LDEQ explained that the "*primary purpose* of community air monitoring is to provide accurate and timely information about air quality *to surrounding communities*, fostering transparency and promoting public health," and that CAMRA "establishes clear standards for non-governmental entities to conduct air quality monitoring." Joshi Decl., Ex. 1, at 7 (emphases added); *see id*. (stating that CAMRA "ensure[s] public access to accurate air quality information"). The report also explains that CAMRA regulates "[c]ollecting data on pollutants" and "[r]equir[es] monitoring entities to provide clear and accessible explanations of their findings and data *to the public*." *Id*. (emphasis added). The report's repeated emphasis on public dissemination of air quality data from community groups refutes Defendants' litigation stance that "[n]one of

9

CAMRA's provisions restrict Plaintiffs from collecting or sharing air monitoring data, criticizing environmental conditions, or petitioning the government." Defs.' Mem. 12.

## II.    This Court has jurisdiction to adjudicate Plaintiffs' claims.

### A.    Plaintiffs have Article III standing.

"'[S]tanding contains three elements': injury in fact, causation, and redressability." *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Injury-in-fact "requires the plaintiff to demonstrate an injury that is 'concrete,' 'particularized,' and 'actual or imminent, not speculative.'" *Id.* (quoting *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024)). "Causation requires the plaintiff to show 'that the injury was likely caused by the defendant,' and redressability requires the plaintiff to demonstrate 'that the injury would likely be redressed by judicial relief.'" *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

"In pre-enforcement cases alleging a violation of the First Amendment's Free Speech Clause, the Supreme Court has recognized that chilled speech or self-censorship is an injury sufficient to confer standing." *Barilla v. City of Houston, Tex.*, 13 F.4th 427, 431 (5th Cir. 2021). Accordingly, "standing rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir.) (quoting *Justice v. Hosemann*, 771 F.3d 285, 294 (5th Cir. 2014)), *cert. denied sub nom. Nat'l Press Photographers Ass'n v. Higgins*, 145 S. Ct. 140 (2024). "A plaintiff bringing such a challenge need not have experienced 'an actual arrest, prosecution, or other enforcement action' to establish standing." *Barilla*, 13 F.4th at 431 (quoting *Susan B. Anthony List v. Driehaus*, 573 U. S. 149, 158 (2014)).

Here, Plaintiffs seek to collect, use, and disseminate information about air quality, but they are deterred from doing so because of CAMRA's restrictions on community air monitoring and the

liability that attaches to entities that violate those restrictions. *See supra* p. 5. "[T]he fact that the Plaintiffs are now subject to [laws] that are [invalid] is itself a concrete injury sufficient to give them standing" because "[w]hen a plaintiff is an object of a regulation there is ordinarily little question that the action or inaction has caused him injury." *Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 110 F.4th 762, 773 (5th Cir. 2024) (internal quotation marks omitted).

Further, Plaintiffs have satisfied the requirements for bringing a pre-enforcement First Amendment challenge. Such challenges may be brought when the plaintiff "(1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) his intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." *Nat'l Press Photographers Ass'n*, 90 F.4th at 782 (cleaned up). With respect to the third element, "in the speech context, [the court] 'may *assume* a substantial threat of future enforcement absent compelling contrary evidence.'" *Id.* (quoting *Barilla*, 13 F.4th at 433). Here, Plaintiffs' speech on air quality is unquestionably "affected with a constitutional interest" under the First Amendment. *Nat'l Press Photographers Ass'n*, 90 F.4th at 782 (quoting *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020)). Moreover, Plaintiffs' air monitoring activities are "arguably proscribed" by CAMRA. *Id.* (cleaned up); *see* Section I, *supra*. And because CAMRA implicates Plaintiffs' free speech rights, the Court may assume that Plaintiffs face a "substantial threat of future enforcement" given the absence of any "compelling" evidence to the contrary. *Nat'l Press Photographers Ass'n*, 90 F.4th at 782 (internal quotation marks omitted).

Defendants' contrary position on injury rests solely on their contention that CAMRA "*does not prohibit* Plaintiffs from collecting air monitoring data, sharing it publicly, or engaging in advocacy." Defs.' Mem. 6. Defendants' view of CAMRA does not reflect what LDEQ has said.

11

*See* Joshi Decl., Ex. 1, at 7. It also does not lessen the "substantial threat of enforcement" that Plaintiffs face because "nothing binds [Defendants] here—[they] (or a future holder of [their] office) could change [their] mind[s] and decide" that the community air monitoring programs that Plaintiffs seek to operate violate CAMRA. *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 218 (5th Cir. 2023).

Finally, the Article III elements of causation and redressability are present. Defendants are the cause of Plaintiffs' harm because they enforce CAMRA and can bring administrative and judicial actions, including for civil penalties, if Plaintiffs speak about air quality in a way that CAMRA prohibits. *See* La. R.S. § 30.2025. And this Court can redress the harm by granting the declaratory and injunctive relief that Plaintiffs seek. *See, e.g.*, *Barilla*, 13 F.4th at 431 n.1 (holding that complaint satisfied causation and redressability because the ordinance "caused [the plaintiff] to self-sensor and a ruling in [his] favor would prohibit the City from engaging in enforcement."); *Speech First, Inc.*, 979 F.3d at 338 ("[P]otential enforcement of the challenged policies caused Speech First's members' self-censorship, and the injury could be redressed by enjoining enforcement of those policies." (cleaned up)).

Plaintiffs have Article III standing.

**B.    Defendants do not have sovereign immunity.**

Unless validly abrogated by Congress, sovereign immunity generally deprives federal courts of jurisdiction over private suits against nonconsenting states and state officials. *See Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 396 (5th Cir. 2025). In *Ex parte Young*, 209 U.S. 123 (1908), however, the Supreme Court recognized that sovereign immunity does not prevent a federal court from "enjoin[ing] a state official in his official capacity from taking future actions in furtherance of a state law that offends federal law or the federal Constitution." *Healthy Vision Ass'n*, 138 F.4th at 396 (quoting *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir.

2014)). "For a suit against a state official to proceed under *Ex parte Young*, three criteria must be satisfied: (1) A plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege an ongoing violation of federal law; and (3) the relief sought must be properly characterized as prospective." *Id.* at 396 (cleaned up) (quoting *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc)). The analysis under *Ex parte Young* "significantly overlaps with Article III standing." *Inst. for Free Speech v. Johnson*, -- F.4th --, 2025 WL 2104354, at *9 (5th Cir. July 28, 2025) (cleaned up).

Defendants correctly do not dispute that Plaintiffs satisfy the second and third criteria. The second criterion is satisfied because "enforcement of the allegedly unconstitutional act [need not] be in progress against the particular plaintiff initiating suit." *Roake v. Brumley*, 141 F.4th 614, 638 (5th Cir. 2025) (quoting *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999)). The third criterion is satisfied because Plaintiffs seek prospective relief. *See Healthy Vision Ass'n*, 138 F.4th at 395, 401 (First Amendment rights); *City of Austin v. Paxton*, 943 F.3d 993, 999 (5th Cir. 2019) (preemption).[2]

As for the first criterion, the Fifth Circuit has held that the state officials named as defendants must be "proper defendants," which requires them to have "some connection with the enforcement of the law being challenged." *Healthy Vision Ass'n*, 138 F.4th at 396 (internal quotation marks omitted). Such a connection exists where there is "a mere scintilla of enforcement by the relevant state official with respect to the challenged law," and the official has "more than

---

[2] Citing the partially vacated decision in *Freedom From Religion Foundation, Inc. v. Mack*, 4 F.4th 306 (5th Cir. 2021), *vacated in part*, 49 F.4th 941, 948 n.4 (5th Cir. 2022), Defendants suggest that *Ex parte Young* cannot be invoked in "official capacity" cases if the cause of action is based solely 42 U.S.C. § 1983. Defs.' Mem. 8 n.2. The Supreme Court, however, has applied *Ex parte Young* in cases brought under section 1983. *See Reed v. Goertz*, 598 U.S. 230, 233–34 (2023).

13

the general duty to see that the laws of the state are implemented." *Spectrum WT v. Wendler*, -- F.4th --, 2025 WL 2388306, at *11–*12 (5th Cir. Aug. 18, 2025) (cleaned up). Both conditions are satisfied here.

To start, a "scintilla of enforcement" exists "in view of the constraining effect of [Defendants'] statutory duties. *Healthy Vision Ass'n*, 138 F.4th at 398; *see also Inst. for Free Speech*, -- F.4th at --, 2025 WL 2104354, at *9 (holding that *Ex parte Young* applied where state law vested officials with "exclusive jurisdiction" to determine if violations occurred). Defendants have been charged by state law with enforcing CAMRA through various mechanisms, including civil penalties. La. R.S. § 30:2025. "Any civil action necessary to carry out the provisions of this Subtitle *shall* be brought by the secretary [Ms. Burdette]," and "[i]n such suits, the secretary *shall* be represented by the attorney general [Ms. Murrill]." *Id.* § 30:2025.A (emphasis added). Likewise, "[u]pon determining that a violation of any requirement of this Subtitle has occurred or is about to occur, the assistant secretary for the office of environmental compliance [Mr. Lang] *shall* issue an order requiring compliance within a specified time period, or the secretary [Ms. Burdette] *shall* commence a civil action for appropriate relief, including a temporary or permanent injunction." *Id.* § 30:2025.C(3) (emphasis added). Where state law "vest[s]" the defendants "with enforcement authority," they are proper defendants for purposes of *Ex parte Young*. *Inst. for Free Speech*, -- F.4th at --, 2025 WL 2104354, at *9 (citing *K.P. v. LeBlanc*, 627 F.3d 115, 124–25 (5th Cir. 2010)); *see Healthy Vision Ass'n*, 138 F.4th at 400 (holding that official was a proper defendant where she had "a statutory duty to enforce the law.").

Defendants also "have more than the general duty to see that the laws of the state are implemented." *Spectrum WT v. Wendler*, -- F.4th at --, 2025 WL 2388306, at *12 (internal quotation marks omitted). As noted above, Secretary Burdette and Assistant Secretary Lang have duties

14

specific to CAMRA and other state environmental laws. *See Nat'l Press Photographers Ass'n*, 90 F.4th at 786 (holding that officials who are "*directly* responsible for enforcing Texas's criminal laws" had more than a general duty to enforce state law). And notwithstanding the state attorney general's general authority to enforce Louisiana laws, Attorney General Murrill is a proper defendant here because she has specific responsibilities under La. R.S. § 2025. *See White Hat v. Murrill*, 141 F.4th 590, 601 (5th Cir. 2025) (distinguishing, for purposes of *Ex parte Young*, between an attorney general's general duties and her role as an "enforcer of specific" statutes (quoting *Texas Alliance for Retired Ams. v. Scott*, 28 F.4th 669, 674 (5th Cir. 2022))).

Defendants respond that CAMRA does not specify "any form of enforcement mechanism or penalties." Defs.' Mem. 9. But they do not dispute the enforcement powers set out in La. R.S. 30:2025 apply to violations of CAMRA.

Defendants also argue that Attorney General Murrill is not a proper defendant because she has "discretion" whether to represent LDEQ in an enforcement action. Defs.' Mem. 10. But the presence of a degree of discretion "does not foreclose a plaintiff from using the extension of authority to an official to enforce a statute to 'connect' an official's discretion to actual enforcement by indicating some reasonable prospect of how that discretion is to be exercised." *Healthy Vision Ass'n*, 138 F.4th at 397. Here, the Attorney General "shall" represent LDEQ in "civil action[s]" to enforce CAMRA but, if she does not do so, she decides whether to "concur[]" to representation by an agency attorney. La. R.S. § 30.2025.A. She therefore has a direct role in CAMRA's enforcement.

Defendants' argument that *Ex parte Young* requires a showing of a "demonstrated willingness" to enforce CAMRA, Defs.' Mem. 8–10 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)), also lacks merit. The Fifth Circuit first articulated the "demonstrated

willingness" standard in 2001. *See Okpalobi v. Foster*, 244 F.3d 405, 416–17 (5th Cir. 2001) (en banc). In 2021, however, in *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), the Supreme Court applied *Ex parte Young* to permit suits against Texas officials based on their statutory authority and duties to enforce the law at issue, without addressing whether those officials were "willing" to enforce the law. *See id.* at 45–47 (Gorsuch, J., for four-justice plurality); *id.* at 59–60 (Roberts, C.J., for four justices, concurring in part and dissenting in part). Although the Fifth Circuit has not addressed the effect of *Whole Woman's Health* on the "willingness" prong of *Okpalobi*, the Supreme Court's reasoning shows that an official's "willingness" to enforce a challenged law does not affect the *Ex parte Young* analysis.

In any event, a willingness requirement would be met here. Although Defendants contend that "Plaintiffs have not alleged that any sort of enforcement action has occurred here," Defs.' Mem. 10, "[d]irect enforcement is not required." *Healthy Vision Ass'n*, 138 F.4th at 396 (cleaned up). And the "comprehensive refusal of an officer with mandatory statutory duties to repudiate those obligations" may be sufficient to "lead[] to a credible … fear of enforcement" sufficient to a permit pre-enforcement challenge under *Ex parte Young*. *Id.* at 400 n.2; *see Inst. for Free Speech*, -- F.4th at --, 2025 WL 2104354, at *9 (concluding that *Ex parte Young* applied because "there is no indication that [defendants] will not initiate enforcement here"); *Book People, Inc. v. Wong*, 91 F.4th 318, 335–36 (5th Cir. 2024) (holding that the state official had sufficient connection to the law challenged by book vendors because the official's authority to enforce law against school districts that purchased books from vendors had the effect of compelling speech).

Defendants do not suggest they would not enforce CAMRA. Rather, they assert that CAMRA does not prohibit Plaintiffs' collection and dissemination of air quality data. As explained above, that assertion is irreconcilable with LDEQ's interpretation and with the plain text of the

statute, *see supra* pp. 9–10, and Defendants have offered no basis for concluding that they lack the authority or willingness to forbear from enforcing LDEQ's (correct) interpretation of CAMRA. As a result, Plaintiffs have had to "self-censor[]" to lessen the risk of onerous liability. *Healthy Vision Ass'n*, 138 F.4th at 400; *see* Lavigne Decl. ¶¶ 6–11; Robertson Decl. ¶¶ 11–12; Banner Decl. ¶¶ 11–13; Taylor Decl. ¶¶ 10–12; Stelly Decl. ¶¶ 8–9; Vittitow Decl. ¶¶ 7–8, 10–11. Sovereign immunity does not bar this Court from granting Plaintiffs relief.

## III.    CAMRA violates Plaintiffs' First Amendment rights.

**A.** The First Amendment, applicable to the states under the Fourteenth Amendment, protects the freedom of speech and the right to petition the government. With respect to the freedom of speech, the First Amendment deprives state governments of the "power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. Laws that are "facially content neutral" are "considered content-based regulations of speech" when they "cannot be justified without reference to the content of the regulated speech, or … were adopted by the government because of disagreement with the message the speech conveys." *Id*. at 164 (cleaned up). A law that "singles out specific subject matter … for differential treatment" is a "content-based speech restriction." *Hines v. Pardue*, 117 F.4th 769, 789 (5th Cir. 2024) (internal quotation marks omitted). Content-based regulation of speech is subject to strict scrutiny, *Reed*, 576 U.S. at 164, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest," *id*. at 171 (internal quotation marks omitted).

"When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector*

*and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "Viewpoint discrimination exists when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Hines*, 117 F.4th at 788 n.4 (internal quotation marks omitted). In addition, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger*, 515 U.S. at 828. Thus, "the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression." *Id*. Laws "favoring some speakers over others" are evaluated under "strict scrutiny when the legislature's speaker preference reflects a content preference." *Reed*, 576 U.S. at 170 (internal quotation marks omitted).

CAMRA checks all these boxes. At the outset, CAMRA applies only to one group of speakers: entities that operate community air monitoring programs. La. R.S. § 2381.3. The statute expressly excludes "[m]onitoring performed by 'reporting entities'" from its reach. *Id*. § 2381.4(2), (11). Thus, if an industry polluter collects, analyzes, and disseminates air monitoring data to the public, it may freely speak about that data without regard to CAMRA's requirements. Community groups, such as Plaintiffs, that wish to engage in counter-speech, by contrast, risk liability and crippling civil penalties if their air monitoring activities do not satisfy CAMRA's standards. In this way, CAMRA "favor[s] some speakers over others." *Reed*, 576 U.S. at 170 (internal quotation marks omitted). Although the state asserts an interest in promoting "accurate air quality information," La. R.S. § 30:2381.2, "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody v. NetChoice, LLC*, 603 U.S. 707, 741–42 (2024). Where "the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First

18

Amendment is plainly offended." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 785–86 (1978) (footnote reference omitted).

Moreover, CAMRA necessarily imposes content-based regulation because it applies "because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. CAMRA's purpose is "to ensure that the data collected from [community air monitoring] programs provides the public with access to accurate air quality information." If Plaintiffs speak about another topic, or even speak about air quality without using air monitoring data, they may do so freely without Louisiana attempting to police whether the information provided to the public is sufficiently "accurate" to satisfy state standards. It is thus the content of Plaintiffs' speech that triggers CAMRA. The statute is a quintessential content-based regulation of speech.

CAMRA's substantive provisions confirm that the statute regulates speech based on content and that it discriminates against viewpoints. Under section 2381.5, community groups are free to collect and disseminate air monitoring data so long as the levels of pollution detected fall within regulatory standards. Because Plaintiffs intend to use the data collected to inform the public or regulators of potential violations or noncompliance with air quality standards, *see supra* pp. 8–9, they will violate CAMRA because their air monitors do not meet EPA-designated standards. *See id.*, p. 3. Plaintiffs' liability thus depends on the content (monitoring data) and viewpoint expressed (whether the data indicate compliance with regulatory limits) of Plaintiffs' speech.

Sections 2381.6 and 2381.9 on their face regulate speech based on its content. Section 2381.6 restricts the methods by which "monitoring data" may be analyzed and, if a state-accredited laboratory is not used, compels Plaintiffs to "include quality assurance certification of methods or equipment" if they wish to communicate their analysis to others. Similarly, section 2381.9, entitled "Data communications," prohibits [a]ny release or communication of monitoring data" without

"clear explanations of data interpretation, appropriate context, including the applicable or comparable ambient air standard data limitations, and relevant uncertainties." "[T]he First Amendment guarantees 'freedom of speech,'" which "necessarily compris[es] the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988). Sections 2381.6 and 2381.9 transgress those limits by restricting speech that does not contain state-mandated disclaimers or otherwise fails to satisfy state-mandated standards.

Finally, Section 2381.10 imposes special burdens based on the speaker and message expressed. Section 2381.10 limits the use, disclosure, or dissemination of air monitoring data in enforcement proceedings, but *only* if that data comes from community air monitoring programs. Because CAMRA only applies to "entities" that receive public or use private funds, *see* La. R.S. § 30:2381.4(2), (9), (10), but exempts industry, *id*. § 30:2381.4(2), (11), industry voices (and perhaps regulators like LDEQ) may freely use, disclose, or disseminate air monitoring data to oppose (or reject bringing) an enforcement action. However, a community air monitoring program that that wishes to communicate its findings to LDEQ or EPA, or to use and disclose those findings in a citizen suit against a polluter, *see* 42 U.S.C. § 7604, would face liability and civil penalties unless the data are collected and analyzed in accordance with CAMRA's standards. By its terms, section 2381.10 impermissibly "favor[s] one speaker over another," *Rosenberger*, 515 U.S. at 828.

Defendants do not argue that CAMRA survives strict scrutiny. Their response to Plaintiffs' free speech claim is grounded entirely in their view that CAMRA does not restrict Plaintiffs' ability to collect, use, and disseminate air quality information derived from their air monitoring programs. That view is untenable for the reasons explained above. *See* Section I, *supra*. Nonetheless, a few points in response to Defendants' arguments are warranted.

First, citing *National Press Photographers Ass'n*, Defendants contend that CAMRA regulates conduct rather than speech. *See* Defs.' Mem. 11. But the law challenged in that case imposed flight restrictions on drones—an activity that "is not inherently expressive"—and the plaintiffs there argued that the First Amendment required "a specific exemption for the press." 90 F.4th at 787–88. That is far afield from CAMRA, the express purpose of which is to ensure that the "public [has] access to accurate air quality information," La. R.S. § 2381.2, and the substantive provisions of which impose restrictions based on the identity of speakers and the message expressed. Because the question whether Plaintiffs can speak without violating CAMRA "depends on what they say," CAMRA operates as a restriction on speech, not conduct. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010).

Second, Defendants argue that CAMRA is subject to intermediate scrutiny, rather than strict scrutiny, because it has "only an incidental effect on protected speech." Defs.' Mem. 12 (quoting *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291, 2306 (2025)). *Free Speech Coalition*, however, concerned an age-verification law designed to further the state's constitutionally valid interest in "prevent[ing] minors from accessing speech that is obscene from their perspective." *Id.* In applying intermediate scrutiny, the Court emphasized that the law "does not directly regulate the protected speech of adults." *Id.* at 2309. By contrast, CAMRA *does* directly regulate constitutionally protected speech. Therefore, strict scrutiny, not intermediate scrutiny, is the proper First Amendment standard.

**B.** CAMRA also violates Plaintiffs' right to petition. The "government is prohibited from infringing" on the right to petition "by a general prohibition against certain forms of advocacy … or by imposing sanctions for the expression of particular views it opposes." *Smith v. Highway Employees*, 441 U.S. 463, 464 (1979) (per curiam) (internal citation removed). To preclude a

person from "us[ing] the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests" "would be destructive of rights of association and of petition." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972).

Here, CAMRA's restrictions do not provide exceptions for the use or dissemination of air monitoring data in advocacy directed at federal or state environmental regulators or courts. Indeed, section 2381.10 expressly prohibits community air monitoring programs from using, disclosing, or disseminating data or analysis "for purposes of or in support of" an enforcement action against an air polluter. Accordingly, a community group cannot share data with LDEQ or EPA to support an administrative or judicial enforcement action, or use data to bring a citizen suit against a polluter, unless the group satisfies CAMRA's requirements.

CAMRA also burdens non-litigation petitioning. CAMRA's restrictions on what community groups can say about air quality and how they can say it limits their ability to use air sensor data to lobby governmental policymakers for actions to address harmful levels of air pollution, including appealing emissions limits in air permits issued by LDEQ. *See, e.g.*, Taylor Decl. ¶ 4 (discussing use of air quality data to successfully lobby for relocation of a school and to lobby for additional fenceline monitoring). By attaching liability to such communications, CAMRA violates the Petition Clause.

Defendants' only response is to deny that CAMRA attaches liability to petitioning activities. Defs.' Mem. 13. That view is erroneous. *See* Section I, *supra*. Plaintiffs are entitled to summary judgment on their Petition Clause claim, as well as on their free speech claims for the reasons stated above.

**IV.    CAMRA's restrictions are preempted by federal law.**

Under the Supremacy Clause, "state laws that conflict with federal law are without effect." *Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304, 311 (5th Cir. 2023). To determine whether a conflict exists, the court must "examin[e] the explicit statutory language and structure and purpose of the statute." *Id.* (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990)). When "compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," state law is preempted. *Id.* at 313 (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015)).

CAMRA's restrictions on community air monitoring programs conflict with federal law. To start, the Clean Air Act authorizes EPA to bring enforcement actions based on any information "available" to EPA about potential violations of emissions standards, and rewards persons who "furnish[] information … which lead[s] to a criminal conviction or a judicial or administrative civil penalty." 42 U.S.C. § 7413(a), (b), (d), (f). CAMRA, however, imposes liability on community air monitoring programs if they disseminate air quality data that does not satisfy CAMRA's requirements, and expressly prohibits such programs from disseminating noncompliant data in support of enforcement actions. By regulating the information community groups may disclose, CAMRA necessarily restricts the information that EPA can receive.

For similar reasons, CAMRA cannot be reconciled with the Clean Air Act's citizen suit provision, 42 U.S.C. § 7604. That provision grants "any person" a federal cause of action "against any person … who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of" emission standards or limits or an EPA or state order. *Id*. § 7604(a)(1). The citizen suit provision also requires 60 days' prior notice to EPA and the state before commencing suit. *Id*. § 7604(b)(1). CAMRA, however, restricts the air monitoring data that

can be disclosed to EPA and LDEQ to satisfy the notice requirement, *see* La. R.S. §§ 30:2381.6, 30:2381.9, and prevents a citizen suit plaintiff from using noncompliant air monitoring data "for purposes of or in support of … [b]ringing a … judicial enforcement action or proceeding against any person." La. R.S. § 30:2381.10.B(2); *cf. Haywood v. Drown*, 556 U.S. 729, 736 (2009) (holding that states cannot use jurisdictional rules to "nullify a federal right or cause of action they believe is inconsistent with their local policies").

CAMRA also impedes efforts by Congress and EPA to promote greater use of air sensors and community air monitoring. *See supra* pp. 2–3. Through grants funded by the American Rescue Plan, the Inflation Reduction Act, and other funding and loan programs, EPA has sponsored deployment of air sensor technologies to fenceline, low-income, and disadvantaged communities, among others, and has encouraged communities to take an active role in measuring their air quality. Indeed, Plaintiffs Micah 6:8, CCSJ, and Claiborne have deployed air sensors to measure air quality pursuant to EPA grants, which can impose conditions on the use and dissemination of air quality data. *See* Robertson Decl. ¶ 11; Stelly Decl. ¶ 6 & Ex. 1, at 4; Taylor Decl. ¶ 7. By prohibiting community groups such as Plaintiffs from using air sensor technology that do not utilize EPA-designated measurement methods, and imposing onerous conditions on the use and dissemination of data, CAMRA "discourage[s] conduct that federal legislation specifically seeks to encourage." *City of Morgan City v. S. La. Elec. Co-op. Ass'n*, 31 F.3d 319, 322 (5th Cir. 1994).

Defendants' principal response again rests on its misreading of CAMRA's requirements. Defs.' Mem. 15 ("The statute regulates only how *Louisiana*—through DEQ—uses certain community-collected air data in its own enforcement proceedings."). To the extent that Defendants also contend that 42 U.S.C. § 7416 saves CAMRA from conflict preemption, *see* Defs.' Mem. 15, that contention is misplaced. A "saving clause … does *not* bar the ordinary working of conflict

24

pre-emption principles." *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000). In any event, as Defendants agree, Defs.' Mem. 15, CAMRA does not set "standards or limitations respecting emissions of air pollutants" or impose "any requirement respecting control or abatement of air pollution." 42 U.S.C. § 7416. CAMRA therefore does not fall within the scope of section 7416.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion to dismiss.

September 5, 2025

Respectfully submitted,

David Bookbinder
(DC Bar No. 455525)
Environmental Integrity Project
888 17th Street NW
Washington, DC 20006
(301) 751-0611
dbookbinder@environmentalintegrity.org
*Admitted pro hac vice*

Mariah Harrod
(TX Bar No. 24143847)
Environmental Integrity Project
888 17th Street NW
Washington, DC 20006
(856) 503-8645
mharrod@environmentalintegrity.org
*Admitted pro hac vice*

/s/ Caitlion O'Neill
Caitlion O'Neill
(LA Bar No. 40566)
RISE St. James Louisiana
2150 Allston Way
Suite 460
Berkeley, CA 94704
(504) 321-1360
chunter@risestjames.org

/s/ Nandan M. Joshi
Nandan M. Joshi
(DC Bar No. 456750)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-7733
njoshi@citizen.org
*Admitted pro hac vice*

ATTACHMENT

TEXT OF COMMUNITY AIR MONITORING RELIABILITY ACT

**§ 2381.1. Short title**

This chapter shall be known and may be cited as the Louisiana Community Air Monitoring Reliability Act.

**§ 2381.2. Purpose**

The purpose of this Chapter is to establish standards for community air monitoring programs operated by entities to ensure that the data collected from such programs provides the public with access to accurate air quality information.

**§ 2381.3. Applicability**

This Chapter shall apply to entities that have implemented community air monitoring programs as defined in this Chapter.

**§ 2381.4. Definitions**

As used in this Chapter, unless the context indicates otherwise, the following terms have the following meanings:

(1) "Ambient air" means that portion of the atmosphere, external to buildings, to which the general public has access as defined in 40 CFR 50.1.

(2) "Community air monitoring programs" means measurement systems, testing equipment, tools, and processes of ambient air used or developed for the purpose of collecting air emissions data and measuring or recording air pollutant concentrations by entities that received public funds or use private funds. Such shall include both one-time monitoring events as well as multi-sampling events. Monitoring performed by "reporting entities" as defined in this Section for any purpose, including as required under judicial or administrative action, are excluded from this definition and shall be subject to the requirements of the applicable statutes, rules, judicial action, or administrative action governing monitoring by reporting entities.

(3) "Criteria air pollutants" include those air pollutants for which NAAQS have been established under Section 109 of the federal Clean Air Act, 42 U.S.C. 7409, including ozone, particulate matter, carbon monoxide, lead, sulfur dioxide, and nitrogen dioxide.

(4) "Department" means the Louisiana Department of Environmental Quality.

(5) "Environmental Protection Agency" or "EPA" means the United States Environmental Protection Agency.

(6) "Hazardous air pollutant" means a hazardous air pollutant as such term is defined in Section 112(a) of the federal Clean Air Act, 42 U.S.C. 7412.

(7) "Toxic air pollutants" means the term as defined in LAC 33:5103.

(8) "National Ambient Air Quality Standards" or "NAAQS" means the national ambient air quality standards established under Section 109 of the federal Clean Air Act, 42 U.S.C. 7409.

1

(9) "Public funds" means any money that has been awarded, granted, distributed, or otherwise provided by federal, state, tribal, or local governments, departments, agencies, and instrumentalities.

(10) "Private funds" means any money other than public funds.

(11) "Reporting entities" means any organization, group, company, owner, or operator of a stationary source developing or administering an air monitoring program.

(12) "Stationary source" means a stationary source as such term is defined in Section 112(a) of the federal Clean Air Act, 42 U.S.C. 7412(a).

## § 2381.5. Community air monitoring program requirements

A. Community air monitoring programs which seek to conduct monitoring of criteria air pollutants for the purpose of alleging violations or noncompliance with the federal Clean Air Act, Louisiana Environmental Quality Act, or any other applicable law, rule, or regulation for which the state has primary enforcement authority shall use the science-based standards set forth in 40 CFR Parts 50 and 58, including the NAAQS.

B. Community air monitoring programs which seek to conduct monitoring of hazardous air pollutant or toxic air pollutant emissions for the purpose of alleging violations or noncompliance with the federal Clean Air Act, Louisiana Environmental Quality Act, or any other applicable law, rule, or regulation for which the state has primary enforcement authority shall use an Environmental Protection Agency-approved or promulgated emission test or monitoring method, or the latest revision to such methods approved or promulgated by the Environmental Protection Agency.

## § 2381.6. Data collection integrity

The parameters, equipment, and analytical methods along with any modeling or mapping software utilized for analysis of the monitoring data shall use the most current Environmental Protection Agency-approved or promulgated emission test or monitoring method. Analysis must be conducted through a laboratory approved by the Louisiana Environmental Laboratory Accreditation Program, known as LELAP, or include quality assurance certification of methods or equipment. Utilization of proprietary or not publicly available equipment or methods shall not be acceptable for community air monitoring programs.

## § 2381.7. Monitoring for criteria air pollutants

A. The department may use the data collected through the community air monitoring program to review compliance with the state's promulgated air monitoring requirements as part of its assessment of compliance with the air quality standards in 40 CFR Part 50, including the NAAQS.

B. If community air monitoring data indicates that ambient air is not in compliance with the NAAQS as determined in accordance with 40 CFR Part 50, the department may consider necessary actions to address the issue, including but not limited to identifying sources of pollution,

2

implementing pollution control measures, and engaging in public outreach and education. All actions taken by the department to address noncompliance with NAAQS shall be consistent with the federal Clean Air Act, if applicable.

### § 2381.8. Monitoring for hazardous air pollutants

A. The department may use the data collected through the community air monitoring program to review compliance with the state's ambient air quality standards for hazardous air pollutants and toxic air pollutants.

B. If community air monitoring data indicates that ambient air is not in compliance with the ambient air standards specified in LAC 33:III. Chapter 51, the department may consider necessary actions to address the issue, including but not limited to identifying sources of pollution, implementing pollution control measure, and engaging in public outreach and education. All actions taken by the department to address noncompliance with ambient air standards shall be consistent with the Louisiana Environmental Quality Act, if applicable.

### § 2381.9. Data communication

Any release or communication of the collected monitoring data shall include clear explanations of data interpretation, appropriate context, including the applicable or comparable ambient air standard data limitations, and relevant uncertainties.

### § 2381.10. Prohibition on use of monitoring data

A. Data produced from community air monitoring programs alone is insufficient to demonstrate a stationary source is in violation of rule, regulation, or permit condition.

B. To promote compliance with this Chapter and the collection of accurate and reliable data from community air monitoring programs, any data produced from community air monitoring programs that are not in compliance with this Chapter shall not be used, disclosed, or disseminated by the department for purposes of or in support of the following:

(1) Issuing a fine, penalty, or violation against any person, including the owner or operator of a stationary source.

(2) Bringing an administrative, regulatory, or judicial enforcement action or proceeding against any person, including the owner or operator of a stationary source.

C. The prohibitions under this Section apply to use by the department or any person of any monitoring data not in compliance with this Chapter for purposes of alleging violations or noncompliance with the federal Clean Air Act, Louisiana Environmental Quality Act, or any other applicable law, rule, or regulation for which the state has primary enforcement authority.

### § 2381.11. Severability

If any provision of this Act or the application thereof to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of the Act which can be given

effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable.

**Codification Note**

Title 30, Chapter 16-A Louisiana Community Air Monitoring Reliability

The enrolled bill states that CAMRA will be codified at RS 30:2383.1 et seq. It was instead codified at RS 30:2381.1 et seq.